FILED

2018 Aug-15  PM 08:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

CRAIG CARGILE, ADMINISTRATOR OF
THE ESTATE OF JOHN B. MCLEMORE,

     PLAINTIFF,

v.

SERIAL PRODUCTIONS, LLC;
THIS AMERICAN LIFE PUBLIC
BENEFIT CORPORATION;
BRIAN REED;
CHICAGO PUBLIC MEDIA, INC.;
SHITTOWN, LLC;
SERIAL PODCAST, LLC; AND
AMERICAN WHATEVER, LLC,

     DEFENDANTS.

CASE NO: 7:18-CV-01167-LSC

JUDGE L. SCOTT COOGLER

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

Relevant Allegations and Introduction ....................................................2

Standard of Review...........................................................................8

Argument........................................................................................9

    **1.**    **S-Town is protected by the First Amendment of the United States Constitution.** ...........................................11

    **2.**    **S-Town is exempt from the Act.**....................................17

        **a.**    **S-Town is protected by the Act's fair use exception.**...........18

        **b.**    **S-Town is not a "product" or "advertisement" regulated by the Act.**...........................................20

    **3.**    **The Estate's other claims also fail as a matter of law and should be dismissed.** ...........................................23

Conclusion .....................................................................................25

Certificate of Service ........................................................................27

Defendants Serial Productions, LLC; This American Life Public Benefit Corporation ("TAL"); Brian Reed ("Reed"); Chicago Public Media, Inc.; Shittown, LLC; Serial Podcast, LLC; and American Whatever, LLC (collectively, "Defendants") submit this Memorandum of Law in support of their Motion to Dismiss (the "Motion") all claims of Plaintiff Craig Cargile, administrator of the Estate of John B. McLemore (the "Estate").

The Estate fails to state a claim upon which relief can be granted by the Court, making dismissal of its claims proper under Fed. R. Civ. P. 12(b)(6). The Estate asserts that Defendants violated the Alabama Right of Publicity Act (the "Act"), Code of Alabama Section 6-5-770, *et seq*., by including the late John B. McLemore ("McLemore") as a documentary subject and journalistic source in the Peabody Award-winning S-Town podcast.[1] However, under the First Amendment and by the Act's express terms, the Act has no application here.

---

[1] The Peabody Awards were introduced by a committee of the National Association of Broadcasters to be an equivalent of a Pulitzer Prize for radio. Peabody Awards, "Who We Are: Origin of the Award," (available at http://www.peabodyawards.com/about#originawards) (last accessed Aug. 12, 2018). "Since 1940 the Peabody award has steadily grown from being the 'Pulitzer Prize for Radio' to recognizing excellence in a wide range of electronic media." *Id*. In granting its award, the Peabody Awards stated that S-Town "breaks new ground for the medium by creating the first true audio novel, a nonfiction biography constructed in the style and form of a 7-chapter novel. Three years in the making, reporter Brian Reed and producer Julie Snyder started down the road of the procedural and wound up creating true audio art. The result was both widely acclaimed and wildly popular." Peabody Awards, "S-Town" (available at http://www.peabodyawards.com/award-profile/s-town) (last accessed Aug. 12,

## RELEVANT ALLEGATIONS AND INTRODUCTION

S-Town is an audio documentary consisting of interviews and documentary recordings of dozens of people, presented with narration and scored with original music.  It is a journalistic and artistic work that documents and reports on life in Bibb County, Alabama, including the life and death of resident McLemore.

As alleged in the Estate's Complaint[2] ("Complaint" or "Compl."), following an email from McLemore to "the staff" of TAL, Reed, a TAL producer, traveled to Alabama to investigate McLemore's claim that there had been a murder in Woodstock, Alabama.  (Compl. ¶¶ 15-16.)  Reed interviewed McLemore while in Alabama, and had phone calls and exchanged emails with him.  (Compl. ¶ 16.)

On June 22, 2015, McLemore committed suicide.  (Compl. ¶ 17.)  After his death, Reed contacted family and friends to learn more about him.  (Comp. ¶ 18.)  Using these interviews, Reed and other Defendants produced the podcast S-Town, which Defendants released March 28, 2017.[3]  (Compl. ¶¶ 19-21.)  The podcast is

---

2018).  The Court may take judicial notice of S-Town winning the award since winning the award is a matter of public record that cannot reasonably be questioned.  *See Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1260 n. 2 (11th Cir. 2006).

[2] The Estate commenced this action on July 12, 2018 in the Circuit Court of Bibb County, Alabama.  Defendants timely removed the action to this Court July 26. (Dkt. 1.)

[3] The probate court did not appoint the administrator of the Estate until June 19, 2017, two years after McLemore's death and more than two months after the podcast was released.  (Compl. Ex. 1.)

presented in seven chapters, each lasting about one hour.[4]  (Compl. ¶ 19.)   Since

its premiere on or about March 28, 2017, the podcast has been downloaded more

than 80 million times.  (Compl. ¶¶ 20 and 24.)  The podcast can be heard by

visiting the S-Town website, https://stownpodcast.org/.[5]  (*See* Compl. ¶ 21, n.1.)

S-Town has corporate sponsors, who are identified on the podcast.

S-Town is a documentary account of matters of public interest.  Among

other things, the podcast reports:

- On the history of Bibb County and Woodstock.  (Ex. 8, Ch. 7, 8:57-12:35, 58:13-59:58; Ex. 7, pp. 4-6, 25.)

- How the Woodstock police, town clerk and community responded to McLemore's suicide.[6]  (Ex. 8, Ch. 3 (in its entirety), Ch. 4, 55:30-57:30; Ex. 3 (in its entirety), Ex. 4, pp. 26-27.)

---

[4] The Federal Circuit has defined a podcast to be "a digital media file made available through web syndication, in which new installments or 'episodes' are automatically received by subscribers."  *Personal Audio, LLC v. Electronic Frontier Association*, 867 F.3d 1246, 1248 (Fed. Cir. 2017).

[5] A transcript of each chapter can be accessed from the S-Town website.  True and correct copies of each of the seven chapter transcripts, with time stamps that correlate to the time and location of the audio of S-Town, are attached to this Motion as Exhibits 1-7, respectively.  A thumb drive with the audio of the podcast, which has been marked as Exhibit 8, will be filed with the Court and served on the Estate.  Citations to S-Town are made both to the audio and transcripts.  For instance, "Ex. 8, Ch. 4, 4:52-11:29; Ex. 4, pp. 4-6" is a citation to the actual audio of the podcast (Ex. 8), within Chapter 4 (each chapter has its own audio file within Exhibit 8), from 4 minutes, 52 seconds to 11 minutes, 29 seconds.  There is then a parallel citation to the corresponding pages of the transcript of Chapter 4 (Ex. 4).

[6] The Court may consider the content of S-Town itself when considering the motion because it is central to the Estate's claim.  The Estate also references the podcast in the Complaint and provides a web address where the podcast can be accessed. *See infra* at 10-11.

- How the Bibb County probate court managed the disposition McLemore's property after his death.  (Ex. 8, Ch. 4, 4:52-11:29; Ex. 4, pp. 4-6.)

- How McLemore's cousin worked with the town attorney, town clerk and the courts to secure guardianship of McLemore's mother, who suffered from dementia.  (Ex. 8, Ch. 5, 33:12-34:01; Ex. 5, p. 14.)

- On Tyler Goodson, McLemore's friend and former employee, taking vehicles and property previously owned by McLemore, how the police investigated the sale of those vehicles, and how the investigation was complicated by an officer's friendship with the suspect.  (Ex. 8, Ch. 5, 1:09-2:18, 16:48-24:24; Ex. 5, pp. 1-2, 8-11.)

- On the search for suspected hidden treasure.  (Ex. 8, Ch. 4, 12:59-17:30; Ex. 4, pp. 7-8.)

- On the perspective of McLemore, who professed to hate the Town of Woodstock (which he called "Shittown"), and also from those who love it – such as the former town clerk, whose husband was elected mayor.  (Ex. 8, Ch. 7, 19:04-21:31; Ex. 7, pp. 9-10.)

- On the struggles of poverty, including how simple traffic fines can multiply and burden those who cannot afford to pay them.  (Ex. 8, Ch. 5, 41:35-42:14; Ex. 5, p. 18.)

- On racial attitudes.  (Ex. 8, Ch. 2, 6:53-8:43, Ch. 7, 46:56-48:32; Ex. 2, pp. 4-5, Ex. 7, p. 22.)

- On the experience of being a non-heterosexual man in Alabama.  (Ex. 8, Ch. 3, 44:38-45:49, Ch. 6 (in its entirety); Ex. 3, p. 17, Ex. 6 (in its entirety).)

- On the effects of having grown up in an abusive household.  (Ex. 8, Ch. 2, 6:04-6:32, Ch. 5, 41:06-47:26; Ex. 2, p. 4, Ex. 5, pp. 17-20.)

- On depression and mental health.  (Ex. 8, Ch. 1, 12:22-18:01, Ch. 3, 4:38-18:06; Ex. 1, pp. 6-8, Ex. 3, pp. 3-7.)

- On horology, the  study of time and the making of time-measuring devices.  (Ex. 8, Ch. 1, 0:01-1:35, Ch. 2, 38:38-40:29, Ch. 4, 20:12-27:08, Ch. 7, 0:01-6:35; Ex. 1, p. 1, Ex. 2, pp. 20-21; Ex. 4, pp. 9-13, Ex. 7, pp. 1-3.)

4

- On mercury poisoning.  (Ex. 8, Ch. 7, 27:56-35:28; Ex. 7, pp. 12-15.)

- On global warming and the earth's limited resources.  (Ex. 8, Ch. 2, 31:14-35:03, Ch. 3, 5:22-6:53; Ex. 2, pp. 17-18, Ex. 3, p. 3.)

These are just a few examples of the wide range of public interest topics documented in S-Town.

Not only is S-Town a documentary work of public interest, it is also an artistic and expressive work.  S-Town tells a story by employing descriptive images, metaphors, drama and humor, among other literary devices.  It builds plot and evokes emotion.  It references and draws on other literary works, including fiction by William Faulkner, Shirley Jackson and Edgar Allen Poe.  (Ex. 8, Ch. 1, 32:14-33:24, Ch. 4, 43:28-44:00; Ex. 1, p. 16; Ex. 4, p. 20.)  The production is scored with original music and integrates the work of established musicians such as The Zombies (Ex. 8, Ch. 1, 49:33; Ex. 1, p. 24) and Andrea Bocelli (Ex. 8, Ch. 5, 6:04-7:02; Ex. 5, pp. 3-4).  The opening minutes of the first chapter, which describe the challenges of restoring old clocks, provide a lyrical entry point into the story S-Town tells, and illustrate the artistic character of the entire podcast.  (Ex. 8, Ch. 1, 0:01-1:55; Ex. 1, p. 1.)

Plaintiff brings claims against the Defendants for violating the Act.[7]  The Act was enacted in 2015 to give clarity to those wishing to use others' likenesses.

_____

[7] The Estate makes no claim for defamation or any allegation that the content of S-Town was untrue and makes no claim for invasion of privacy.  Nor could it, since

5

*See* Ala. Code § 6-5-722; Othni J. Lathram, "Alabama's Right of Publicity Act," 76 THE ALABAMA LAWYER 256 (July 2015) (available at https://www.alabar.org/assets/uploads/2014/08/The_Alabama_Lawyer_07-2015.pdf#page=48)                (last accessed Aug. 12, 2018).   Before the Act, Alabama recognized a common-law right to publicity.  *See Minnifield v. Ashcraft*, 903 So. 2d 818, 824 (Ala. Civ. App. 2004).  As of the filing of this Motion, there were no reported cases interpreting the Act.

Because S-Town is both a public interest and an artistic work, the Estate's claims must fail.  First and foremost, the imposition of liability under the Act in connection with S-Town would violate the First Amendment free speech rights of the Defendants.

Imposition of liability also would violate the Act itself.   The Alabama legislature wanted to be sure that "nothing in [the Act] will allow for an abridgement of free speech rights under the First Amendment of the United States Constitution and Section 4 of the Constitution of Alabama of 1901."  Ala. Code § 6-5-773(b).  As a result, the Act:

- expressly excludes from liability (and treats as a "fair use") any use of the indicia of identity in connection with "a news, public affairs, or public interest account…or documentaries;" *or* "an artistic or expressive work, such as a . . . literary work, . . . television program, radio program or the like"; and

---

libel and violation of privacy are both "personal claims" that cannot be brought by an estate posthumously. *Fitch v. Voit*, 624 So.2d 542, 543-44 (Ala. 1993).

- imposes liability for the unauthorized use of the indicia of identity *only* in connection with the advertising or sale of "products, good, merchandise or services entered into commerce."

*Id.* (emphasis added).  The Complaint must be dismissed because S-Town falls precisely within the broad fair use exception under the Act.  S-Town, a 2017 Peabody award winning podcast, is specifically exempted under the Act as a public interest documentary work.  It is also specifically exempted as an expressive and artistic work.  The creation and distribution of S-Town is exactly the type of constitutionally-protected speech the Alabama legislature took great pains to exclude from liability under the Act.

In addition, the actual content and the nature of S-Town make it impossible to allege the most basic element under the Act, that S-Town "uses or causes the use of the indicia of identity of a person, on or in products, goods, merchandise, or services entered into commerce in this state, or for purposes of advertising or selling, or soliciting purchases of, products, goods, merchandise, or service." The Estate attempts to transform S-Town from a public interest/artistic work as defined by the Act into a seven-part advertisement for goods and services by alleging that S-Town has sponsors.  If the Estate's argument had any validity (which it does not), it would turn every news program, television program, radio program "or the like" into commercial advertising and it would require the court to ignore core First

Amendment principles and the clear language of the Act.  The burden on free speech would be constitutionally impermissible.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id*. (quoting *Twombly*, 550 U.S. at 557).  *See also Kelley v. Decatur Baptist Church,* No. 5:17-CV-1239-HNJ, 2018 WL 2130433, at *4 (N.D. Ala. May 9, 2018).  A complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555); *see also Mills v. Foremost Ins. Co*., 511 F.3d 1300, 1303 (11th Cir. 2008). These "conclusory allegations . . . are not entitled to an assumption of truth – legal conclusions must be supported by factual allegations."  *Bishop v. Ross Earle & Bonan, P.A*., 817

F.3d 1268, 1270 (11th Cir. 2016) (quoting *Randall v. Scott*, 610 F.3d 701, 709–10 (11th Cir. 2010)).

Whether speech is a protected expression or matter of public interest is a question of law that can be decided by the Court.  *See, e.g., Ruffin-Steinback v. dePasse*, 267 F.3d 457 (6th Cir. 2001) (affirming district court's grant of a motion to dismiss right of publicity claim against producers of a mini-series about the musical group the Temptations without the band's permission); *Somerson v. World Wrestling Entm't, Inc.*, 956 F. Supp. 2d 1360 (N.D. Ga. 2013) (granting motion to dismiss right to publicity claim because use of plaintiff's likeness was newsworthy); *Thoroughbred Legends, LLC v. The Walt Disney Co.*, No 1:07-CV-1275-BBM, 2008 WL 606253, at *10-11 (N.D. Ga. Feb. 12, 2008) (granting motion to dismiss invasion of privacy and publicity claims).

## ARGUMENT

The Estate fails to state a claim.  The First Amendment of the United States Constitution and Section Four of the Alabama Constitution guarantee the Defendants' right to produce and distribute S-Town.  S-Town also is protected by the Act itself, which classifies as "fair use" and exempts from liability under that Act works in the public interest or works of expression.  Furthermore, the Act does not apply because the interviews with McLemore (or descriptions of him) were not

used to sell or advertise "products, goods, merchandise, or services." For these reasons, the Complaint must be dismissed with prejudice.

The Court may listen to S-Town or read the transcript and consider them when ruling on this Motion. Under both Federal and Alabama law, material that is central to a plaintiff's claim and referred to in the complaint is incorporated by reference into the complaint and can be used by a defendant in a motion to dismiss so long as the authenticity of the document is undisputed. *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th Cir.1999) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *Donoghue v. American Nat'l Ins. Co.*, 838 So.2d 1032, 1035 (Ala. 2002) (quoting *Wilson v. First Union Nat'l Bank of Georgia*, 716 So.2d 722, 726 (Ala. Civ. App. 1998)) ("if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss"); *see also Newson v. Protective Indus. Ins. Co. of Alabama*, 890 So. 2d 81, 83–84 (Ala. 2003) ("facts contained in such documents also may be considered"). Furthermore, "[w]hen the exhibits attached to a complaint contradict its allegations, the court is not required to accept the allegations as true." *Clay v. Thompson*, No. 2:14-CV-131-WKW, 2014 WL 3655990, at *2 (M.D. Ala. July 23, 2014) (citing *Griffin Industries v. Irvin*, 496

10

F.3d 1189, 1205–06 (11th Cir. 2007)).  The same principle holds under Alabama law.  *Doggett v. Hunt*, 93 F.Supp. 426 (S.D. Ala. 1950).

The Estate's claim is based solely on the content of the S-Town podcast. (*See, e.g.,* Compl. ¶¶ 33-35.)  The Estate also explicitly refers to the online location of the podcast, https://stownpodcast.org/, in the Complaint, incorporating the work by reference. (*See* Compl. ¶ 21, n.1.)  Because S-Town is incorporated into and made part of the Complaint by reference, any inconsistencies between the podcast and the Complaint must be resolved by the content of the podcast itself.  *See Clay*, 2014 WL 3655990, at *2.

1.   **S-Town is protected by the First Amendment of the United States Constitution.**

As an audio documentary, S-Town falls squarely within the core categories of speech protected by the First Amendment.  *See Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981) ("motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee").  This constitutional protection extends to works that depict real people, whether celebrities or regular people.  "Books, films, plays, and television shows often portray real people. Some are famous and some are just ordinary folks. Whether a person portrayed in one of these expressive works is a world-renowned film star—'a living legend'—or a person no one knows, she or he does not own history."  *De Havilland v. FX Networks, LLC*, 21

11

Cal. App. 5th 845, 849–50, 230 Cal. Rptr. 3d 625, 630 (Ct. App. 2018), *review denied* (July 11, 2018).

S-Town has been described as an "unearthing of the mysteries of one man's life." (Compl. ¶ 21.)  The podcast transforms the "raw materials" of the happenings of Woodstock and its inhabitants, including McLemore, into a public interest and artistic work.  This is precisely what is protected by the First Amendment, which "safeguards the storytellers and artists who take the raw materials of life—including the stories of real individuals, ordinary or extraordinary—and transform them into art, be it articles, books, movies, or plays." *Sarver v. Chartier*, 813 F.3d 891, 905 (9th Cir. 2016) (dismissing right of publicity claim by army sergeant who claimed he was portrayed in the film *The Hurt Locker*).  Accordingly, courts have repeatedly rejected right of publicity claims on free speech grounds to protect works that tell stories about, including, or based on the lives of real people.  *See, e.g., Alfano v. NGHT, Inc.*, 623 F. Supp. 355 (E.D.N.Y. 2009) (dismissing right of publicity claim of plaintiff depicted with John Gotti in documentary about organized crime in New York); *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 544-46 (1993) (dismissing right of publicity claim by surfer depicted in documentary film about California surf culture on grounds film was protected speech on newsworthy subject); *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118, 1123 (N.D. Cal. 2002) (reality television program about unsigned rock bands); *Seale v.*

*Gramercy Pictures*, 949 F. Supp. 331, 337 (E.D. Pa. 1996) (use of plaintiff's persona in dramatized film about the Black Panthers); *Matthews v. Wozencraft*, 15 F.3d 432, 439-40 (5th Cir. 1994) (use of former undercover police officer's identity in film and novel); *Tyne v. Time Warner Entm't Co., L.P.*, 901 So.2d 802, 810 (Fla. 2005) (protecting the film *The Perfect Storm*, a dramatized account of the disappearance of a fishing vessel and crew during a powerful storm); *Rosemont Enterprises, Inc. v. McGraw-Hill Book Co.*, 85 Misc. 2d 583, 587, 380 N.Y.S.2d 839 (N.Y. Sup. 1975) (unauthorized, fictional biography could not provide the basis for a misappropriation claim because "Howard Hughes is no different from any other person in that he cannot have a monopoly, nor can he give a monopoly to any entity, with respect to works concerning his life").[8]

---

[8] *See also Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 692 (2010) (magazine feature not actionable notwithstanding its proximity to advertising in the magazine); *Ruffin-Steinback v. dePasse*, 82 F. Supp. 2d 723, 730 (E.D. Mich. 2000) (unauthorized miniseries about members of the Temptations); *Hicks v. Casablanca Records*, 464 F. Supp. 426 (S.D.N.Y. 1978) (use of name and characteristics of Agatha Christie in fictional film); *Meeropol v. Nizer*, 560 F.2d 1061, 1066-67 (2d Cir. 1977) (alleged fictionalized account of Julius and Ethel Rosenberg trial not actionable under misappropriation theory; both "historical" and "fictional" works are fully protected by the First Amendment); *Moore v. Weinstein Co., LLC*, 545 F. App'x 405, 409 (6th Cir. 2013) (protecting the movie *Soul Men*, noting that "[w]ithout a doubt, the [m]ovie added significant expressive elements to any purported use of Moore's identity"); *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal.3d 860, 866 (1979) (unauthorized use of Hollywood actor's name and likeness in semi-fictional movie); *McKinney v. Morris*, No. LC095322, 2013 WL 5617125, (Cal. Ct. App. Oct. 15, 2013) (dismissing right of publicity claims brought by individual depicted in documentary film about abuses in the Mormon church).

In keeping with this body of precedent, Alabama courts have held that the First Amendment protects public interest, expressive and artistic speech against common-law publicity right claims.  *J.C. v. WALA-TV, Inc.*, 675 S.2d 360 (Ala. 1996.)  As the Alabama Supreme Court observed:

> This legitimate public interest privilege is not merely limited to the dissemination of news either in the sense of current events or commentary upon public affairs. Rather, the privilege extends to information concerning interesting phases of human activity and embraces all issues about which information is needed or appropriate so that individuals may cope with the exigencies of their period.

*Id*. at 362 (quoting *Campbell v. Seabury Press*, 614 F.2d 395, 396 (5th Cir. 1980)); *see also Doe v. Roe*, 638 So.2d 826, 829 (Ala. 1994) (recognizing that there cannot be a misappropriation of publicity where a work is a "significant medium for the communication of ideas" and "possesses social worth").  "Furthermore, "[w]orks of artistic expression such as movies, plays, books and songs are protected by the First Amendment."  *Esch v. Universal Pictures Co.*, No. 6:09-cv-02258-JEO, 2010 WL 5600989, at *5 (N.D. Ala. Nov. 2, 2010).

While the Estate alleges that matters covered by S-Town were not "matters of legitimate public concern" (Compl. ¶ 21), this conclusory allegation ignores and is contradicted by the content of the podcast.  The podcast discusses many topics of public interest including a criminal investigation and how it was interpreted by the public; the suicide of a central figure in his community and its effect on the

14

community; the potential whereabouts of missing treasure; the actions of officials and authorities including Alabama courts, the Woodstock town clerk, the Woodstock town attorney, the Woodstock mayor, and members of various Alabama police departments; as well as topics such as the distrust of public officials and the courts; poverty; sexual, physical, and emotional abuse; racism; mental health; the history and practice of horology; the history of Bibb County and Woodstock; the life experience of being a sexual minority in Alabama; climate change and the state of global resources; the effects of chemical exposure; friendship; grief; and the experience of life – its joys and disappointments – in rural Alabama.  *See* citations to S-Town transcript *supra* at 3-5.

That S-Town had commercial sponsors does not diminish its protection. "[I]n addressing right of publicity claims, courts have been mindful that the First Amendment provides greater protection to works of artistic expression . . . than it provides to pure 'commercial' speech."  *Seale*, 949 F. Supp. at 337.   The distinction is that "commercial speech is best understood as speech that merely advertises a product or service for business purposes."  *Tyne*, 901 So.2d at 809) (citing *Cardtoons L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996)).

Just because speech helps sell a publication or exposes viewers to an advertisement or other sales opportunities does not make it purely commercial in a

way that would negate First Amendment protection.  *Somerson*, 956 F. Supp. at 1370 (though biographical information could draw readers to a website who might then "click on another link to purchase tickets or other merchandise," that "commercial use would be incidental to the public's interest").  Similarly, having a financial motive to publish a work does not convert an expressive work into a purely commercial one.  *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501, 72 S. Ct. 777, 780, 96 L. Ed. 1098 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment."); *Found. for Lost Boys v. Alcon Entm't, LLC*, No. 1:15-CV-00509-LMM, 2016 WL 4394486, at *21 (N.D. Ga. Mar. 22, 2016) ("[e]ven if Defendants profit from the release of *The Good Lie*, that is not enough for Plaintiffs to state an appropriation claim; the use itself must be improper"); *Falwell v. Penthouse Intern., Ltd.*, 521 F. Supp. 1204, 1210 (W.D. Va. 1981) ("everything that appears in a magazine is placed with the intention of increasing sales" but using that as the rubric as to whether speech is for the "purposes of trade" would "intrude on important constitutional freedoms, which guarantee the uninhibited dissemination of ideas").[9]

---

[9] *See also Haskell v. Stauffer Commc'ns, Inc.*, 26 Kan. App. 2d 541, 545, 990 P.2d 163, 166 (1999) ("[t]he cases uniformly apply the newsworthiness privilege to matters published by the media even though they are published to make a profit"); *Guglielmi*, 25 Cal. 3d at 868 (Bird, C.J., concurring) ("The First Amendment is not limited to those who publish without charge. Whether the activity involves

S-Town is an expressive, journalistic work entitled to First Amendment protection.  It is not an advertisement, but an award-winning documentary podcast.  (*Supra* at 3-5.)  The Estate attempts to strip it of First Amendment protection by alleging that discussion of "McLemore's sexual orientation and experiences, depressed thoughts, suicidal ideations, financial affairs, physical and mental health issues, and his interpersonal relationships with friends, family members, and sexual partners" are not "matters of legitimate public concern."  (Compl. ¶ 21.)  However, the podcast's exploration of those issues are among the very issues and "interesting phases of human activity . . . about which information is needed or appropriate so that individuals may cope with the exigencies of their period."  *WALA-TV*, 675 S.2d at 362.  S-Town is prototypical First Amendment-protected speech.

**2.     S-Town is exempt from the Act.**

Mindful of the First Amendment protections for public interest, documentary, expressive and artistic works like S-Town, the Alabama legislature specifically exempted such works from its recently-enacted right of publicity statute.  Because S-Town does not fall within the scope of the Act – indeed it is expressly exempted from it – the Estate's claims must be dismissed.

---

newspaper publication or motion picture production, it does not lose its constitutional protection because it is undertaken for profit.").

### a. S-Town is protected by the Act's fair use exception.

S-Town is protected by multiple categories of the Act's fair use exception.

Under the Act:

> It is a fair use and not a violation of Section 6-5-772 if the use of the indicia of identity is in connection with a *news, public affairs*, or *public interest account*, political speech or a political campaign, live or prerecorded broadcast or streaming of a sporting event or photos, clips, or highlights included in broadcasts or streaming of sports news or talk shows, or *documentaries*, or any advertising or promotion of the same (*public interest work*), or is part of *an artistic or expressive work, such as a live performance, work of art, literary work, theatrical work, musical work, audiovisual work, motion picture, film, television program, radio program or the like (artistic work)*, or any advertising or promotion of the same, unless the claimant proves, subject to [the Constitution of United States and of Alabama], that the use in an artistic work is such a replica as to constitute a copy of the person's indicia of identity for the purposes of trade.

Ala. Code § 6-5-773(b) (emphasis added).  Because S-Town qualifies both as a "public interest work" and an "artistic work," it cannot violate the Act.

S-Town is exempt as a "public interest work" because it is both a "public interest account" and a "documentary" (*see supra* at 3-5), fitting squarely within the express language of the fair use exception to the Act.  Every element and theme the podcast documents are matters of public interest.  (*See supra* at 3-5.)  The fact that the podcast has "been downloaded more than 80 million times" empirically attests to the public interest in it.  (Compl. ¶ 24.)

Alabama courts recognize that works similar to S-Town involve the public interest.  In *Doe v. Roe*, the adoptive father of two children whose biological father murdered their biological mother sued the author of a novel about the murder.  638 So.2d at 826-27.  The adoptive father claimed that the book was an invasion of the children's privacy and that it appropriated "a tragic event in their lives for commercial gain."  *Id.* at 829.  The Alabama Supreme Court overturned the trial court's injunction barring the novel's release, finding that the novel "possesses social worth and is a significant medium for the communication of her ideas about an event in which society has an interest" and thus did not misappropriate the children's personalities.  *Id.* at 829-30.  Similarly, S-Town "possesses social worth and is a significant medium for the communication" of ideas that the Act's fair use exception protects.  This holding is consistent with courts around the country, which have rejected state right of publicity claims over works like S-Town.  *See supra* at 11-14 & n.8.

S-Town also is an "artistic work," another category independently excluded from the Act.  The Act provides examples of artistic or expressive works including "a live performance, work of art, literary work, theatrical work, musical work, audiovisual work, motion picture, film, television program, radio program *or the like*."  Ala. Code § 6-5-773(b) (emphasis added).  S-Town is certainly "like" these other expressions; the only distinguishing factor is the electronic media in which it

19

is distributed.  Further, the Estate's unsupported allegation that S-Town discusses matters that are not of "legitimate public concern" is of no moment.  (Compl. ¶ 21.)  The Act does not require an artistic work to be a "public interest account" in order to fall outside the purview of the statute.  Ala. Code § 6-5-773(b).  Finally, courts consistently protect artistic works from right of publicity claims.  *See, e.g., Thoroughbred Legends*, 2008 WL 606253, at *11; *supra* at 11-14 & n.8.  While the Act may clarify the law of publicity, it does not reduce any of the protections courts have developed.

In short, S-Town is precisely the type of work that falls within the fair use exception to the Act.

### b.    S-Town is not a "product" or "advertisement" regulated by the Act.

In addition to being expressly exempted by the Act's fair use provision, the Estate's claims also fail because S-Town simply is not a product or advertisement the Act regulates.  The Act provides relief for the use of the indicia of identity of a person when those indicia of identity are used either (a) "on or in" or (b) "for purposes of advertising or selling" the Defendants' "products, goods, merchandise, or services."   Ala. Code § 6-5-772(a).  However, the Estate fails to adequately allege either (1) that S-Town is a product, good, article of merchandise or service or (2) that McLemore's indicia of identity were used for the purpose of advertising or selling a product, good, article of merchandise or service.

20

First, the Estate fails to allege facts that the Defendants used the "indicia of identity of" McLemore "on or in products, goods, merchandise, or services entered into commerce."  Ala. Code § 6-5-772(a).  The Estate alleges that McLemore's indicia of identity were used in S-Town (Compl. ¶ 19), and that such use "constitutes a use of McLemore's indicia of identity on products, goods, merchandise, or services entered into commerce."  (Compl. ¶ 33.)  However, these allegations are insufficient to establish that S-Town itself is a product, good, article of merchandise or service, as the terms should be understood under the Act.

S-Town is not a product, good or article of merchandise or service entered into commerce.  S-Town is a podcast.  (Compl. ¶ 20.)  It tells a story.  (Compl. ¶ 20.)  It is a journalistic documentary (a public interest work) and artistic work rather than a product for sale.[10]  While the terms "products, goods, merchandise, or services" are not defined in the Act, courts have found that, for the purpose of publicity claims, works such as S-Town do not qualify.  *See, e.g., Factors Etc., Inc. v. Pro Arts, Inc*., 652 F.2d 278, 288 (2d Cir. 1981) ("[a] biography, documentary or news article would not be the kind of merchandise covered by the right of publicity").

---

[10]  S-Town can be downloaded for free on its website.  (*See* Comp. ¶¶ 22-24 (describing S-Town's 80 million downloads and alleging that it has generated advertising revenue).)

Second, while the Estate makes the conclusory allegation that Defendants "affirmatively used McLemore's indicia of identity in a commercial manner to advertise, promote, or endorse the products, goods, and services of various advertisers . . . such as Squarespace, Blue Apron, and Quicken Loans/Rocket Mortgage," this allegation is contradicted by the podcast and the advertisements themselves.  (Compl. ¶ 23.)  Neither McLemore's name nor likeness is used in the advertisements that accompany S-Town.  At the beginning and middle of each chapter, the podcast acknowledges its sponsors by saying "support for S-Town comes from" and then states the name of the sponsor and describes the sponsor's good or service.  There is no mention of McLemore in these messages, much less any implication that McLemore or his Estate endorse or support the sponsor.  To the contrary, it is the sponsor declaring its support for S-Town.  As in many public interest or artistic works that may be accessed without charge, the producer requires sponsorship to fund production of the work.

The mere fact that the podcast included advertisements does not mean that McLemore's identity was used "for advertising or selling" under the statute.  *See Somerson*, 956 F. Supp. 2d at 1370 (the "WWE may obtain a commercial advantage if people are drawn to the websites because of plaintiff's biographical information . . . [y]et, such commercial use would be incidental to the public's interest in the history, news reporting, and entertainment of professional

22

wrestling"); *see also Showler v. Harper's Magazine Found.*, 222 F. App'x 755, 762–64 (10th Cir. 2007) ("[t]he fact that the defendant is engaged in the business of publication, for example of a newspaper, out of which he makes or seeks to make a profit, is not enough to make the incidental publication a commercial use of the name or likeness").  To accept Plaintiff's argument would jeopardize exposing every television show, radio program, podcast or newspaper article that has sponsors or advertisers and that refers to or discusses a person to the specter of a suit for breach of the right of publicity.  The burden on free speech would be contrary to the intention of the Act.

S-Town is not the type of work the Act regulates.  It is expressly exempted by the fair use clause.  Neither can it fairly be characterized as a product or advertisement.  The Estate cannot maintain an action under the Act.

### 3.   The Estate's other claims also fail as a matter of law and should be dismissed.

Besides its claim under the Act, the Complaint also alleges claims for: unjust enrichment (Count II), constructive trust/accounting (Count III), and declaratory judgment/injunctive relief (Count IV).  These claims also fail as a matter of law and must be dismissed.

The Estate's unjust enrichment argument fails because it is derivative of its right of publicity claim. *Ruffin-Steinback v. dePasse*, 267 F.3d 457, 462 (6th Cir. 2001) (dismissing unjust enrichment claim derivative of right of publicity claim

when plaintiff relied on same allegations for both claims). The Estate alleges that Defendants were unjustly enriched through the unlawful use of McLemore's name and likeness on the podcast.   (Complaint ¶ 37.)   But, as discussed above, the Defendants production of S-Town was not unlawful. Therefore, "any acquired benefits" cannot be unjust, and the claim "necessarily fails." *Rosa & Raymond Parks Inst. for Self Dev. v. Target Corp.*, 812 F.3d 824, 832 n.17 (11th Cir. 2016) (citing *Tkachik v. Mandeville*, 487 Mich. 38, 790 N.W.2d 260, 266 (2010)); *see also Ruffian-Steinback*, 267 F.3d at 462 ("Finding no error in the district court's resolution of the plaintiffs' right of publicity claims, we likewise find no error in the district court's treatment of the plaintiffs' claims of unjust enrichment."). Because the Estate's unjust enrichment claim is entirely derivative of its claim under the Act, the unjust enrichment claim (Count II) also must fail.

The Estate's "claims" of constructive trust/accounting and declaratory judgment/injunctive relief also fail.   While identified as separate and distinct causes of action in the Complaint, constructive trusts, declaratory judgments, and injunctive relief are actually remedies. *Radenhausen v. Doss*, 819 So. 2d 616, 620 (Ala. 2001) ("a request to impose [a constructive] trust is not a cause of action that will stand independent of some wrongdoing"); *Ex parte Ret. Sys. of Alabama*, 182 So. 3d 527, 535 n.7 (Ala. 2015) (quoting *Alabama Dept. of Transp. V. Harbert Int'l Inc.*, 990 So.2d 831, 840-41 (Ala. 2008) ("the Declaratory Judgments Act

furnishes a remedy for either party against the other to declare the correct status of the law")); *Phillips v. Hobby Lobby Stores, Inc.*, No. 2:16-CV-00837-JEO, 2016 WL 11272150, at *7 (N.D. Ala. Oct. 21, 2016) (citing *Spearman v. Wyndham Vacation Resorts, Inc.*, 69 F. Supp. 3d 1273, 1292 (N.D. Ala. 2014) ("a request for injunctive relief is a type of relief, not a separate cause of action")). Since Counts III and IV are remedies rather than causes of actions, they cannot be sustained and should be dismissed.

## CONCLUSION

For the reasons stated herein, the Court should grant Defendants' Motion to Dismiss and dismiss all of the Estate's claims with prejudice.

25

Dated:  August 15, 2018                         Respectfully submitted,


                                                /s/ *Bennett L. Epstein*
                                                Bennett L. Epstein (admitted pro hac vice)
                                                Peter J. O'Meara (admitted pro hac vice)
                                                FOLEY & LARDNER LLP
                                                321 North Clark Street, Suite 2800
                                                Chicago, IL 60654-5313
                                                T 312.832.4500
                                                F 312.832.4700


                                                Dennis R. Bailey
                                                Bar ID ASB-4845-I71D
                                                RUSHTON, STAKELY, JOHNSTON &
                                                GARRETT, P.A.
                                                184 Commerce Street
                                                Montgomery, AL 36104
                                                T 334.206.3234
                                                F 334.481.0031


                                                *Attorneys for Defendants*
                                                Serial Productions, LLC
                                                This American Life Public Benefit
                                                Corporation
                                                Brian Reed
                                                Chicago Public Media, Inc.
                                                Shittown, LLC
                                                Serial Podcast, LLC
                                                American Whatever, LLC

Of counsel:

Rushton Stakely Johnston & Garrett, P.A.
184 Commerce Street
Post Office Box 270
Montgomery, AL 36101-0270
T 334.206.3234
F 334.481.0031
drb@rushtonstakely.com (email)

26

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August 15, 2018 the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** was filed via the ECF system, thus serving all parties.  Furthermore, the thumb drive containing Exhibit 8 of the Motion will be filed with the Court served upon the following via express delivery:

Richard J.R. Raleigh, Jr.
Christopher L. Lockwood
Wilmer & Lee, P.A.
100 Washington Street, Suite 100
Huntsville, AL 35801
(256) 533-0202
rraleigh@wilmerlee.com
clockwood@wilmerlee.com

R. Cooper Shattuck
Cooper Shattuck, LLC
P.O. Box 3142
Tuscaloosa, AL 35403
(877) 442-6673
cooper@coopershattuck.com

By: /s/ *Peter J. O'Meara* _____