# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA WESTERN DIVISION

**CRAIG CARGILE, Administrator of the Estate of John B. McLemore,**

     **Plaintiff,**

**v.**

**SERIAL PRODUCTIONS, LLC;
THIS AMERICAN LIFE PUBLIC BENEFIT CORPORATION;
BRIAN REED;
CHICAGO PUBLIC MEDIA, INC.;
SHITTOWN, LLC; and,
AMERICAN WHATEVER, LLC,**

     **Defendants.**

**Case No. 7:18-cv-01167-LSC**

**Judge L. Scott Coogler**

**ORAL ARGUMENT REQUESTED**

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Richard J.R. Raleigh, Jr.
Christopher L. Lockwood
Wilmer & Lee, P.A.
100 Washington Street, Suite 100
Huntsville, AL 35801
T (256) 533-0202
F (256) 533-0302
rraleigh@wilmerlee.com
clockwood@wilmerlee.com

R. Cooper Shattuck
COOPER SHATTUCK, LLC
P.O. Box 3142
Tuscaloosa, AL 35403
T (877) 442-6673
cooper@coopershattuck.com

# TABLE OF CONTENTS

INTRODUCTION..............................................................................................1

RESPONSE TO DEFENDANTS' FACTUAL CLAIMS.....................................4

STANDARD OF REVIEW ..............................................................................18

ARGUMENT ..................................................................................................23

I.     The Court Should Defer Defendants' Arguments to Summary Judgment. ............................................................................................23

II.    The Estate Has Alleged a Valid Claim Under the Alabama Right of Publicity Act. ......................................................................25

      A.    *S-Town* Is a "Product." .....................................................28

      B.    *S-Town* Advertises the Products of Others. ....................29

      C.    *S-Town* Is Not Fair Use. ....................................................30

III.    The Estate's Claims Do Not Violate the First Amendment. ....................34

      A.    The Court Need Not Reach Any Constitutional Issues .................34

      B.    The Estate's Claims Do Not Violate the First Amendment ..........28

IV.    The Estate Has Alleged Other Valid State Law Claims. ..........................47

CONCLUSION................................................................................................50

CERTIFICATE OF SERVICE ........................................................................51

## **INTRODUCTION**

> The press is overstepping in every direction the obvious bounds of propriety and of decency. Gossip is no longer the resource of the idle and of the vicious, but has become a trade, which is pursued with industry as well as effrontery. To satisfy a prurient taste the details of sexual relations are spread broadcast in the columns of the daily papers. To occupy the indolent, column upon column is filled with idle gossip, which can only be procured by intrusion upon the domestic circle.

Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 196 (1890).

In 1890, Samuel D. Warren and Louis D. Brandeis published *The Right to Privacy* – a work that would lay the foundation for the development of the right of publicity now recognized in many states, including Alabama. *Id.* Observing that advances in technology were poised to make good on the prediction that "what is whispered in the closets shall be proclaimed from the rooftops," the authors argued for recognition of an individual right to privacy, which would place certain matters of one's private life beyond the realm of the media and public scrutiny. *Id.* at 195.

Echoing the sentiments of this now famous commentary, "Alabama has long recognized that a wrongful intrusion into one's private activities constitutes the tort of invasion of privacy." *Butler v. Town of Argo*, 871 So. 2d 1, 12 (Ala. 2003). Accordingly, Alabama courts have held that the right to privacy makes it wrongful and unlawful to give publicity to private information about a person that violates

ordinary decency. *See e.g. Daily Times Democrat v. Graham*, 162 So. 2d 474 (Ala. 1964) (newspaper picture of woman with her dress blown up at community event); *Minnifield v. Ashcraft*, 903 So. 2d 818 (Ala. Civ. App. 2004) (magazine photographs of tattooed upper breast); and *Tanner v. Ebbole*, 88 So. 3d 856 (Ala. Civ. App. 2011) (display of the plaintiff's body cast).

From the right to privacy developed the right of publicity – the "inherent right of every human being to control the commercial use of his or her identity." J. Thomas McCarthy, *Melville B. Nimmer and the Right of Publicity: A Tribute,* 34 U.C.L.A.L.Rev. 1703, 1704 (1987). In Alabama, the right of publicity has historically been treated as the commercial-appropriation arm of the corresponding right to privacy. *See, e.g. Birmingham Broad. Co. v. Bell*, 259 Ala. 656, 662 (1953). In 1998, surveying Alabama's body of privacy decisions, the Eleventh Circuit concluded that Alabama's right to privacy encompasses rights analogous to those customarily recognized as the right of publicity in other states. *See Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1447 (11th Cir. 1998). The Eleventh Circuit's interpretation was later approved by the Alabama Court of Civil Appeals in *Minnifield v. Ashcraft*, 903 So. 2d at 825-26.

In 2015, the Alabama Legislature enacted the Alabama Right of Publicity Act ("the Act"), *Ala. Code* § 6-5-770, *et seq.* The Act supersedes prior inconsistent

common law on the unauthorized commercial use of a person's indicia of identity. *Ala. Code* § 6-5-771 (Alabama Comment). Plaintiff's co-counsel Cooper Shattuck was a member of Alabama Law Institute committee who helped draft the Act. *See* Lee Armstrong & R. Cooper Shattuck, *Alabama's Right of Publicity Act*, 76 Ala. Law. 256 (July 2015). [1] The Act created a statutory right of publicity for "every person, whether famous or not famous, which endures for the life of the person and for 55 years after his or her death, whether or not the person commercially exploits the right during his or her lifetime." *Ala. Code* § 6-5-771(3). The Act imposes liability against "any person or entity who uses or causes the use of the indicia of identity of a person, on or in products, goods, merchandise, or services entered into in this state, **or** for purposes of advertising or selling, or soliciting purchases of, products, goods, merchandise or services … without consent …." *Ala. Code* § 6-5-772(a) (emphasis added).

As set forth below, Defendants do not dispute that they used McLemore's "indicia of identity" as defined in the Act. Nor do they argue that they possessed McLemore's consent or that of his Estate. Nor do they dispute that the podcast was a commercial endeavor that generated revenue from advertisements. As a result,

---

[1] Defendants cited Shattuck's article in their memorandum but failed to credit him as an author. (Doc. 14-1, p. 8).

they leave little question that the Estate has alleged a valid claim under the Act. Instead, their motion to dismiss primarily raises fact-dependent arguments, which are inappropriate at this stage. The Court should deny Defendants' motion to dismiss and defer their arguments to summary judgment, when the Court will have the benefit of a fully developed record of the applicable facts.

## RESPONSE TO DEFENDANTS' FACTUAL CLAIMS[2]

Defendants argue that the Court should construe the *S-Town* podcast as news – or, maybe as art – they are uncommitted as to which. (Doc. 14-1, pp. 5-8).[3] While this is a predictable response in view of the Act's fair use defenses, *Ala. Code* § 6-5-773, it is contrary to how Defendants described the podcast in their marketing

---

[2] The Estate does not object to the Court's consideration of the content of the *S-Town* podcast, which is central to the Estate's claim that Defendants' used McLemore's indicia of identity. However, the podcast should not be accepted as a completely true account of the facts. Its content is both hearsay and carefully edited by Defendants to portray Defendants in a light most favorable to themselves.

Beyond the podcast, the Estate objects to consideration of other matters not in the record, such as the alleged Peabody Award, (doc. 14-1, p. 1), and Defendants' arguments about the substantive content of the advertisements featured on the podcast. (*Id.*, p. 24). Those items are not in the record and they are beyond the scope of what the Court may consider in resolving Defendants' motion to dismiss.

[3] **Note on Citations:** For clarity of reference, the Estate's citations ("doc. __, p. __") refer to the ECF document and page numbers located at the header of the Court's documents.

efforts to consumers. When attempting to lure an audience (and commercial advertisers) to a podcast about an otherwise unknown person living on a secluded property in rural Alabama, Defendants did not feature the podcast as "news." Nor did they call it "art." They boldly proclaimed it as "an unearthing of the mysteries of one man's life."[4] (Doc. 14-1, p. 14).

The private "mysteries of one man's life" are not news, no matter how titillating they might be to the podcast's 80 million consumers. These "mysteries" represent the very essence of what Alabama's right to privacy and right of publicity are intended to protect. In arguing that *S-Town* is "news," Defendants fail to explain how a story about a man masturbating into McLemore's flower bush is newsworthy. (Doc. 14-7, p. 12). Similarly, they fail to explain how the public possesses a legitimate interest in hearing audio of McLemore's groans while having his nipples tattooed with an empty needle. (Doc. 14-8, pp. 20-23). Defendants want to hide beyond the mantle of "journalism," claiming that the information was obtained from interviews of people close to McLemore. They suppose that if McLemore told private information to his closest companions, it must be perfectly fine for them to

---

[4] https://stownpodcast.org/

broadcast that information to the entire world to sell advertisements for mail-order meals and home mortgages. That is not the law in Alabama.

As summarized below, *S-Town* consists of seven episodes, each of which is progressively more intrusive. By the final two episodes, Defendants make it abundantly clear that they consider no aspect of McLemore's private life off-limits. Ultimately, *S-Town* is neither news nor art – it is an affront to the privacy of an Alabama citizen, done for the sake of commercial profit.

## Episode 1

The podcast begins with McLemore contacting Brian Reed, a producer at *This American Life*, to investigate a suspected murder in McLemore's hometown of Woodstock, Alabama. (Doc. 14-2, p. 2). Prefacing everything to follow, Reed states, "I only learned about all this because years ago an antique clock restorer contacted me, John B. McLemore, and asked me to help him solve a murder." (*Id.*). Reed then recites from McLemore's initial e-mail, which stated: "I would like to tell your producers of two events that have happened here recently. I would hope you have the facilities to investigate." (*Id.*).

McLemore's e-mail prompts a period of written correspondence with Reed, after which Reed travels to Woodstock to meet McLemore. (*Id.*, p. 11). Upon meeting McLemore, Reed reveals to the audience that, although McLemore

professes to hate tattoos, McLemore's body is covered in tattoos (which he conceals beneath his clothing), and that McLemore's nipples are pierced with nipple rings. (*Id.*, p. 20).

## Episode 2

In Episode 2, Reed investigates the suspected murder but ultimately determines that no murder occurred. (Doc. 14-3, p. 16). An unstated amount of time passes after Reed informs McLemore of his findings. (*Id.,* pp. 16-17). Defendants end the episode with Reed receiving a call (which he records) informing him that McLemore had committed suicide. (*Id.*, p. 24). Defendants use the suicide as a cliffhanger for the next episode. (*Id.*)

During Episode 2, Reed insinuates to the audience (despite later revealing the information to be either unlikely or untrue) that McLemore might be secretly wealthy and that he might possess a hidden trove of gold:

> BRIAN REED: […] They claim John has $400,000 in cash, 100-some-odd thousand worth of tools in the workshop, all the antiques around his house. You're going to get $150,000 if you sell that old-ass shit, Bubba says. Rare books in the basement, a single clock worth $10,000 that's just sitting on the floor in a plastic storage bin. Not to mention, says Tyler—
>
> TYLER GOODSON: Gold that his granddaddy – his granddaddy's gold, his daddy's gold.

(*Id.*, p. 9).

**<u>Episode 3</u>**

After McLemore's death, Reed begins a deeper exploration into the details of McLemore's personal life. Reed initially questions the impact of McLemore's death on his planned story about a suspected murder:

> BRIAN REED:  I mean, I want to—I would like to come down and see you guys.  I don't know what's appropriate, I mean, I was slowly doing a story that involved John.  And I got to know him and care about him, and know you guys.  And I'm not sure where that leaves me.  Like, who am I to this situation? You know?

(Doc. 14-4, p. 5).

Ultimately, Reed decides that McLemore's death presents an opportunity for a different story – one that places McLemore in the spotlight.  Reed states, "in the aftermath of his death, a whole other story unfurled in front of me piece by piece." (*Id.,* p. 5).

Prior to the *S-Town* podcast, McLemore's 2015 death did not generate any news interest beyond a three-sentence obituary in *The Birmingham News*.[5]  It remained that way until 2017 when Defendants published the grisly details of his death:

> FAYE GAMBLE:  My phone range at 9:15, and it was all again just like he always answered.  He wanted to know if it was Faye Gamble, and I told him yes.  And he said, this is John B. McLemore, which I

---

[5] http://obits.al.com/obituaries/birmingham/obituary.aspx?pid=175165387

knew who it was. And he said, I just want you to listen to me. I'm going to commit suicide tonight, and I just want you – do not call the police, because if you do, I will shoot them. He was very hyped up.

[…]

And he told me what it was, the potassium cyanide, and that it would be quick. So I listened and I said, John, you do not want to do this. And he says, I'm doing it right now. I am getting it out of the refrigerator. And then he started drinking the mixture. And then he was screaming at me, telling me how it burned, and how he hurt, how horrible it was, the pain. And then I heard the screen door, and then it just went totally silent, except for dogs barking.

(*Id.*, p. 16).

BRIAN REED: The next morning, Tyler says, when he got the news, he went to John's immediately. There was police tape up. It was a crime scene. John's body had already been taken away, but Tyler noticed something on the porch floor and stooped to look. There were John's glasses, twisted up, with some kind of blood or vomit on the lenses. That's where John died, on the porch.

(*Id.*, p. 8).

During the same episode, Reed also claims that McLemore was secretly non-

heterosexual and an atheist:

BRIAN REED: […] I took that to mean John was gay, though when we talked about it after, he told me that he'd gone both ways in his life. And whenever it came up, he never called himself just gay. It was always semi-homosexual or a semi-practicing homosexual, or celibate homosexual.

I haven't been sure if other people around here knew this about John, if Tyler knew. But apparently he does, and he's fine with it.

(*Id.*, p. 18).

> BRIAN REED:  Immediately we're praying, and immediately I'm disoriented, because John was an atheist.  And not a casual atheist or an atheist by default.  He was as fervent a critic of religion as the most zealous evangelists for it.

(*Id.*, p. 12).

## Episode 4

Episode 4 begins with Reed recounting the time he discovered McLemore's suicide note during his first visit to Alabama.  (Doc. 14-5, p. 2).  McLemore tells Reed he does not want to talk about the note and attempts to change the subject several times.  (*Id.*).  While recording their conversation, Reed presses McLemore to discuss the note and his intentions to commit suicide.  (*Id.*).  The episode ends with Reed remarking, "that's not really going to happen, at least not anytime soon.  Which is the same thing I thought when John told me he was going to commit suicide."  (*Id.*, p. 29).

During this episode, Reed states that McLemore was a "college dropout," who left school after three years.  (*Id.*, p. 20).  Reed also claims that McLemore sought mental health treatment in college and tried taking medication but "didn't like the way the medicine altered his personality, and he chose not to seek any more treatment."  (*Id.*, p. 21).

## Episode 5

In Episode 5, Reed questions whether McLemore was neglecting the care of his elderly mother. (Doc. 14-6, p. 7). According to an interview, Reed states that McLemore's home was covered in fleas and that McLemore had boarded up the windows of his mother's bedroom. (*Id.*). Reed also reveals that, despite his earlier insinuations to the audience, McLemore was not, in fact, secretly wealthy, and that when he died, he had a single bank account containing $98. (*Id.*, p. 5).

At one point, while discussing his own role, Reed states, "John called me down here to investigate a murder that in the end never actually happened." (*Id.*, p. 9). The episode ends with Reed speculating about whether McLemore might have desired sexual relationships with several of his younger male companions. (*Id.*, p. 25-26). From here, the podcast progresses rapidly downhill into prurient voyeurism.

## Episode 6

Episode 6 focuses primarily on McLemore's sexual activities. At the beginning of the episode, Reed plays an interview during which McLemore asks him stop recording and supposedly tells him, off the record, about his sexuality. (Doc. 14-7, p. 4). Reed recognizes that journalistic ethics would normally preclude him from revealing this information to the audience, but he self-rationalizes that he has already portrayed McLemore as an atheist who did not believe in God or an afterlife.

(*Id.*).  Reed states McLemore is "worm dirt now, unaffected by this." (*Id.*).  Reed also claims that other people told him the same information about McLemore "on the record." (*Id.*).  After rationalizing his ability to relay this private information to a worldwide audience, Reed states:

> So what he told me was about a local man with whom he'd had a sexual relationship not all that long ago.  I'm not going to say exactly who the man was, because that's the part John wanted secret.  It wasn't the fact that he had been with men that he didn't want recorded, but that he had been with this particular guy.  Because John had talked to me about this guy already, multiple times, and told me that he was not a good person.

(*Id.*).

The episode continues with Reed seeking out the man McLemore identified as a former sexual partner, to ask him about having sex with McLemore.  Reed ambushes the man while his wife is out of the room:

> At a moment when his wife isn't around, I ask the guy if his and John's relationship was romantic, if it was sexual.  I think that's what he wanted, the man says.  I think he just wanted a partner.  Not so much sex, I guess.  I hope not.  Had me scared, though.  And so it wasn't ever sexual with you guys, I ask.  Mm-mm, he says.  'Cause he said otherwise, I tell him.  The man snaps his head towards me with big eyes.  Mm, he says.  I tell him he doesn't need to talk about it if he doesn't want, but because John told me about it, I felt compelled to ask.  Mm, he says again.  He pauses.  Mm-mm.

(Doc. 14-7, p. 4).

Perhaps the most salacious portion of the podcast occurs during Reed's next interview of Olin Long – a friend who had lost contact with McLemore and located

Reed while seeking information about his death. (Doc. 14-7, p. 7). Through the interview of Olin Long, Defendants published descriptions of McLemore's supposed sexual activities:

> OLIN LONG: He had one guy come over. And John had invited him in, and they were in the kitchen. Now, of course, Mary Grace's bedroom is nearby, and so she's in her room asleep. And John asked the gentleman, would you like a glass of water? And he said, sure. So he got him a glass of water. And as he was holding the glass under the faucet running the water, he felt someone come up behind him and start trying to pull his pants down. But John said he gently stopped that, and they ended up out on the porch. And the guy had to expend that sexual energy, so he masturbated on the front porch. And John said he masturbated into whatever that flower bush was there. And then he left.

(Doc. 14-7, p. 12).

> OLIN LONG: He told me that he'd had a relationship at one point with an older man. He called him William.
>
> BRIAN REED: This was John's first relationship, according to Olin. He says John was probably 21 when he met this man called William, which would have been in the late 80's. John told him it was a hot summer's day.
>
> OLIN LONG: And there was a road crew working on the highway right out there in front of John's house. And John said he went out there with some water, kind of like the water boy at a football game. And William was one of the guys out there working on that road crew. And as John said later, William said, the first time I saw you, I knew you were hiding something, that you needed help.
>
> BRIAN REED: Help coming out of the closet, if not to the world, then at least to one other person in the world, which, as far as Olin knows, at that point John had never done. Olin also had an older, more experienced, but still not publicly out man coax him out of the closet

and teach him the ropes of gay life as he knew it. His was a professor at his college, a married professor. John's was a tattooed road crew worker in Bibb County.

OLIN LONG:  According to John, I don't think anyone else down there knew.  William was not obviously gay, no effeminate mannerisms at all.  I also know that he was not very literate.  It was like a symbiotic relationship.  He had something to offer to John, something to help John come out of his isolation.  But at the same time, if he got letters in the mail that looked official, and he couldn't read them well, John would interpret those things for him.  John might write his checks for him.

BRIAN REED: And in exchange, William imparted on John knowledge he had. Olin refers to them as lessons about sex.

[…]

Olin believes John and William were together, engaging in sexual activity in utter secret for at least two years before William moved away, a two-year apprenticeship that William provided to John.

(*Id.*, pp. 9-10).

John told Olin that he'd recently become friends with a guy in town, and they'd started sleeping with each other and spending a lot of time together.  The guy had told John he'd had his eye on him for a while.  He had some college, and he seemed to have ambition in his career, which John liked.  John was head over heels for the guy.  He said to Olin that he'd told the guy he loved him, but that the guy didn't seem to reciprocate it.

(*Id.*, p. 12).

BRIAN REED:  […] John told Olin about meeting a guy from the line in the parking lot of a Church of Christ near his house on a weekday afternoon.  The guy called John once he was there, and John freshened up from doing work on the yard, changed his shirt.  But John told Olin, when he got to the church and saw the guy, he found him repulsive-

looking, a chain smoker with tobacco-stained teeth. The guy promptly made some lewd comments to John. And as John put it, the next thing he knew, the man had grabbed him and shoved his tongue down John's throat. So John pulled away, and left, and refused to swallow the whole ride home, terrified that he might catch some disease lurking in the guy's saliva, until he got into his bathroom and scrubbed his teeth frantically, and gargled, and took a bath.

(*Id.*, p. 11).

OLIN REED: […] I knew exactly what I wanted to do. I wanted to reach over there. I wanted to pull his shirt up, expose his belly, and just kiss all over his belly around that red hair, just to that extent. And I wanted to do it slowly and sensuously.

(*Id.*, p. 19).

BRIAN REED: […] John talked to Olin and to me about how you had to be very careful about that where he lived. And it seems there were only a handful of people in his life he was out to. Olin says John had a refrain he'd use to describe his life in Bibb County. You just learn to live without, he would say, without sex, love, romance, support, companionship, the touch of another person, a partner. You learn to live without.

(*Id.*, p. 11).

## **Episode 7**

In Episode 7, Reed claims that McLemore was racist. (Doc. 14-8, p. 23). He also claims that McLemore's back was tattooed with welts from being whipped by a tree branch, (*id.*, p. 22), and that McLemore would often pay one of his younger companions to tattoo on his nipples with an empty needle. (*Id.*, pp. 23). Reed

speculates that McLemore may have been suffering from mercury poisoning when he died.  (*Id.*, p. 16).

During the episode, Reed plays audio from a video of McLemore groaning while a group of men tattoo on his nipple with an empty needle:

> BRIAN REED:  Tyler starts to pull up a video on his phone to show me.
>
> TYLER GOODSON:  This is when he first got into the tattooing on the nipple.
>
> BRIAN REED:  It's not just him and John.  A couple of his friends are in the video, too.  They're tattooing on John's nipple. Tyler says they were using an empty needle.  There was no point to this tattoo, except for the pain of it.  Tyler tells me, to an extent he understands John's desire for this because he got into tattoos partially because they gave him a similar kind of distraction from his own tortured thoughts.  And he was the one who recommended it as therapy to John.
>
> TYLER GOODSON:  He said I got him into it because I told him how I could kick back and enjoy a tattoo, you know, like a stress reliever. And that's what he--
>
> JOHN B. MCLEMORE:  [GROAN]
>
> TYLER GOODSON:  That's what he done. It was his stress reliever, and buddy, it--
>
> JOHN B. MCLEMORE:  Oh, lord.
>
> TYLER GOODSON:  --kept--
>
> JOHN B. MCLEMORE:  Jeez-o-peet.

(*Id.*, pp. 20-21).

Following the video, Reed describes a photograph of McLemore's tattoos:

> BRIAN REED:  This picture is really disturbing.  It's John's back, which when I visited John was not tattooed.  Like Tyler said, there's a whip that looks as if it's laying across his shoulders and neck, apparently attached to the handle on the other side of him.  And that all across his back, top to bottom, are dozens of red lash marks.  […]
>
> His whole back is just like criss-cross, red, bloody.

(*Id.*, p. 22).

> BRIAN REED:  Tyler tells me that in order to create this tattoo, John went into the woods, hand-picked a tree branch, and asked Tyler and his friends to whip him with it, and then had them tattoo over the welts.

(*Id.*).

> Tyler says the brutality of what John wanted Tyler to do to him kept intensifying, far beyond tattooing with an empty needle, or repeated nipple piercings, or being lashed with a tree branch.

(*Id.*, p. 23).

> TYLER GOODSON:  He fucking was addicted to that shit. He wanted me to come over every fucking day.  Because I mean we'd be over workin' in the shop-- hey, bud, you think we can have a church session real quick?  Like a damn dope fiend or something wanting me to pierce his nipples. But it was just getting' so ridiculous I couldn't keep up with it.

(*Id.*, p. 23).

> TYLER GOODSON:  I pierced his nipples the night he killed himself.
>
> BRIAN REED:  After their day together splashing around the river and spray painting their names under the bridge, their Father's Day, as they called it, Tyler brought John home and John pressured him into doing

that. Just give me a pain fix before you leave, he told Tyler. And Tyler reluctantly did.

(*Id.*, p. 24).

None of the foregoing is news. None of it is a legitimate matter of public concern. None of it is art. These are the bedroom affairs of a private person who died virtually unknown to the world, and who remained that way, without newsworthiness, for nearly two years until Defendants thrust the most private aspects of his life into the homes of more than 80 million consumers. (Doc. 1-1, ¶¶ 17, 20). These are matters "whispered in the closets" that Defendants have "proclaimed from the rooftops." Warren & Brandeis, 4 Harv. L. Rev. at 195.

## <u>STANDARD OF REVIEW</u>

Defendants' arguments are arguments for summary judgment. Accordingly, the Court should deny Defendants' motion to dismiss and defer resolution of Defendants' arguments to summary judgment, when the Court may consider them in light of a fully developed record of the facts. *See Appalachicola Bay & River Keeper, Inc. v. Gulf Power Co*., No. 4:14CV268-MW/CAS, 2014 WL 11512203, at *7 (N.D. Fla. Sept. 26, 2014) ("[T]his Court will exercise its discretion to deny the motion to dismiss and resolve the issue after the parties conduct discovery."). *See also* 5B Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, *Fed. Prac. & Proc. Civ*. § 1357 (3d ed.) ("Of course, the

district court in its discretion may decide that a motion for summary judgment, which provides an opportunity for an investigation of the facts surrounding the bare allegations in the pleading, is a more appropriate procedural device to deal with the built-in defense than a motion to dismiss under Rule 12(b)(6)").

The discretion to defer arguments to summary judgment is appropriately exercised when, as here, a case presents questions of first impression under state law. *See Alabama Pub. Sch. & Coll. Auth. v. JPMorgan Chase Bank*, No. 2:08-CV-863-WKW WO, 2009 WL 2171896, at *7 (M.D. Ala. July 21, 2009) ("To the extent that this action presents an issue of first impression under state law, the court is reluctant to summarily dismiss it at the motion to dismiss stage where the facts are not fully developed."); *Hayden v. Alabama Dep't of Pub. Safety*, 506 F. Supp. 2d 944, 946 (M.D. Ala. 2007) (denying motion to dismiss First Amendment questions of first impression in favor of deciding such issues at summary judgment with a fully developed record); *Great Am. Ins. Co. of New York v. StormGeo Corp., No.* 3:17-CV-554-J-32MCR, 2018 WL 3427875, at *2 (M.D. Fla. July 16, 2018) (deferring to summary judgment); *Planet Fitness Enterprises, Inc. v. PFIP, LLC*, No. 8:08-CV-2305-T-26TGW, 2009 WL 10670913, at *1 (M.D. Fla. Dec. 16, 2009) (same).

In this case, the parties agree that this case presents questions of first impression under the Alabama Right of Publicity Act – both parties acknowledge

that there are no prior reported decisions interpreting the Act. (Doc. 14-1, p. 8). While Defendants' motion to dismiss undoubtedly raises legal questions that will need to be resolved by the Court, the answers to such questions are informed by facts, which need development through discovery.

Beyond these issues, the Court's motion to dismiss standard is well known: In general, a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, in order to withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must "plead enough facts to state a claim to relief that is plausible on its face." *Ray v. Spirit Airlines, Inc.,* 836 F.3d 1340, 1347–48 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Stated another way, the factual allegations in the complaint must be sufficient to "raise a right to relief above the speculative level." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010).

A complaint that "succeeds in identifying facts that are suggestive enough to render [the necessary elements of a claim] plausible" will survive a motion to

dismiss. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1296 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted). In evaluating the sufficiency of a complaint, this Court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The Court then "assume[s] the[ ] veracity" of the complaint's "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.* Review of the complaint is "a context-specific task that requires [this Court] to draw on its judicial experience and common sense." *Id.* If the pleading "contain[s] enough information regarding the material elements of a cause of action to support recovery under some 'viable legal theory,'" it satisfies the notice pleading standard. *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011) (quoting *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683–84 (11th Cir. 2001)).

The review of a motion to dismiss is limited in scope to the face of the complaint. *St. George v. Pinellas Cty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). However, materials attached to a defendant's motion to dismiss may be considered if the plaintiff refers to the document in the complaint, the document is central to the plaintiff's claim, and the authenticity of the document is not in dispute. *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007).

Notwithstanding, in evaluating a motion to dismiss, this Court "accept[s] the allegations in the complaint as true and construe[s] the facts in the light most favorable to the plaintiff." *Johnson v. Midland Funding, LLC*, 823 F.3d 1334, 1337 (11th Cir. 2016).

## ARGUMENT

## I.    The Court Should Defer Defendants' Arguments to Summary Judgment.

As explained in the preceding section, this Court has the discretion to defer Defendants' arguments to summary judgment, so that it will have the benefit of a fully developed record to decide these questions of first impression under the Alabama Right of Publicity Act.  Significantly, Defendants raise no complaint about the level of factual detail in the Estate's complaint.  They do not dispute that the complaint satisfies the pleading requirements of Rule 8, nor they ask for a more definite statement under Rule 12(e).  Instead, they ask the Court to decide the merits of the Estate's claims, in summary fashion, without access to all of the relevant facts.

Defendants are incorrect in asserting that "[t]he Estate's claim is based solely on the content of the S-Town podcast."  (Doc. 14-1, p. 13).  In addition to the podcast, the Estate has alleged that Defendants are attempting to use McLemore's indicia of identity to make a motion picture.  (Doc. 1-1, ¶ 48).  Defendants' use of McLemore's indicia of identity for a movie raises questions distinct from the use of

his identity in the podcast. Additionally, because discovery has not yet been conducted, the Estate has not yet identified every additional way that Defendants may have used McLemore's indicia of identity in violation of the Act.

The Estate also disputes the factual relevance and significance of the alleged Peabody Award, which should not be considered at this stage. (Doc. 14-1, p. 3, n. 1).[6] Whether, and for what reason, *S-Town* received an award is beyond the scope of the Estate's complaint.[7] The Estate expects discovery to show that the award does not describe *S-Town* as a work of news journalism but as "mass entertainment" that "in the end, is really just about the life and times of an eccentric, animated antique clock restorer animated antique clock restorer …."[8] Similarly, in Reed's acceptance speech for the award, he described *S-Town* as "a strange story that didn't really seem

---

[6] In support of their request to consider the award, Defendants cite *Garfield v. NDC Health Corp.*, 466 F. 3d 1255, 1260, n. 2 (11th Cir. 2006). However, that case discussed judicial notice of government documents and hardly supports Defendants' argument for judicial notice of an award.

[7] Other Peabody Award recipients include programs such as *Project Runway, Mystery Science Theater 3000*, and *Where in the World is Carmen San: Diego?*:http://www.peabodyawards.com/award-profile/project-runway; http://www.peabodyawards.com/award-profile/mystery-science-theater-3000; http://www.peabodyawards.com/award-profile/where-in-the-world-is-carmen-sandiego

[8] http://www.peabodyawards.com/award-profile/s-town

like a story, about an unknown curmudgeon in an unremarkable county in Alabama."[9]

Moreover, a single award does not establish consensus. Not everyone agrees that *S-Town* is award-worthy. One reviewer described the program as "an offensive invasion of privacy."[10] Another described it an "incredibly invasive deep dive into one man's life" that "probably shouldn't have been made."[11] Insightfully, another states:

> I remember, when listening to Episode 6, as Brian said, "I'm sharing this even though John had me stop recording because..." I grimaced. I realized, at that moment, that the second the podcast continued after John's suicide, that there was *no consent* on John's part to continue. I felt weird about it. I felt like I'd participated in a serious violation of someone's privacy. The discussions about his gold, about his house, with his lawyer about his will, about his sexuality, his mental health, his *health* in general... it's almost too much. It just goes too far.[12]

(Emphasis in original).

---

[9] *Id.* (embedded video at 2:10).

[10] http://theweek.com/articles/690643/why-stown-offensive-invasion-privacy

[11] https://www.vox.com/culture/2017/3/30/15084224/s-town-review-controversial-podcast-privacy

[12] https://www.writingbetweenpauses.com/blog/2017/3/30/complicated-haunting-invasive-my-thoughts-on-s-town

Reasonable minds clearly disagree about the merits of the podcast. These differing views reflect a quintessential factual dispute for discovery and trial.

## II. The Estate Has Alleged a Valid Claim Under the Alabama Right of Publicity Act.

To determine that the Estate has alleged a valid claim under the Act, the Court should begin by examining what Defendants do **not** dispute. In their motion to dismiss, Defendants do **not** dispute that the Act grants exclusive rights to the Estate concerning the use of McLemore's indicia of identity; **nor** do they dispute that they affirmatively used McLemore's indicia of identity; **nor** do they argue that the facts establish McLemore's consent. Therefore, for purposes of the motion to dismiss, the Court must presume that Defendants used McLemore's indicia of identity, and that they did so without consent. This alone is more than enough to survive Defendants' motion to dismiss.

Examining the text of the Act confirms that the Estate has alleged a valid claim. Section 722 of the Act is entitled "Liability for use of indicia of identity without consent." That section sets forth four distinct circumstances in which liability may arise:

> … any person or entity who uses or causes the use of the indicia of identity of a person, **[1]** on or in products, goods, merchandise, or services entered into commerce in this state, **or [2]** for purposes of advertising or selling, or soliciting purchases of, products, goods, merchandise, or services, **or [3]** for purposes of fund-raising or

solicitation of donations, **or [4]** for false endorsement, without consent shall be liable under this article to that person, or to a holder of that person's rights.

*Ala. Code* § 6-5-772(a) (emphasis and numbering added). Each of the four categories is separate and independent, as reflected by the Legislature's use of the word "or". *Id.*

The Estate's claim easily falls within the first category of liability set forth in the Act: "use of the indicia of identity of a person … on or in products, goods, merchandise, or services entered into commerce in this state …." *Ala. Code* § 6-5-722(a). As alleged in the complaint, Defendants used McLemore's indicia of identity "in or on" a "product" entered into commerce in Alabama. The relevant "product" is the *S-Town* podcast. Defendants do not dispute that they transmitted the podcast to consumers in Alabama and, in doing so, entered the podcast into commerce in this State. *See Fisher's Blend Station v. Tax Comm'n of State of Washington*, 297 U.S. 650 (1936) (finding that commercial radio broadcasting company was engaged in interstate commerce); and *Wirtz v. Indiana Cablevision, Inc.*, 270 F. Supp. 973, 975 (S.D. Ind. 1967) ("It is unquestioned that radio and television broadcasts generally are a subject of interstate commerce."). Instead, they attempt to argue that the podcast is not a "product" under the Act. That argument is easily rejected for the reasons set forth in Section II. A. below.

Separately and independently, the Estate's claim also fits within the second category of liability under the Act: "use of the indicia of identity of a person … for purposes of advertising or selling, or soliciting purchases of, products, goods, merchandise, or services …." *Ala. Code* § 6-5-772(a). This portion of the statute does not require the Estate to show that *S-Town* is a "product" (even though it is). It imposes liability if Defendants used McLemore's indicia of identity to "advertise, sell, or solicit purchases of" their own, or **someone else's** "products, goods, merchandise, or services." *Id.* Here, the Estate clearly alleges that Defendants have used McLemore's indicia of identity for the purpose of advertising, selling, and soliciting purchases of their sponsors' products, goods, merchandise, and services (*e.g.* Squarespace, Blue Apron, Rocket Mortgage, etc.). (Doc. 1-1, ¶ 23). Accordingly, the Estate's claims also fall squarely within the second category of liability set forth in the Act.

Defendants' motion to dismiss raises only two meager arguments for exemption from the Act. As noted above, Defendants do not dispute that they used McLemore's indicia of identity, and they do not argue consent. Instead, they argue (1) that S-Town is not a "product" or "advertisement" regulated by the Act, and (2) that S-Town is protected by the Act's fair use exceptions. Both of those arguments are due to be rejected for the reasons explained below.

### A.   *S-Town* **is a "Product."**

Defendants first ask this Court to rule that the *S-Town* podcast "is not a 'product' or 'advertisement' regulated by the Act." (Doc. 14-1, p. 22). That argument is easily rejected.

First, the ordinary definition of a "product" is "something produced"[13] or a "thing produced by labor."[14] To determine that *S-Town* is a "product," the Court can simply look to the name of the lead defendant: Serial **Productions**, LLC. Clearly, the *S-Town* podcast, **produced** by Serial **Productions**, LLC, with Brian Reed as a **producer**, satisfies the plain and ordinary meaning of a "product." Defendants impliedly concede this in their own brief, claiming that they have a "right to **produce** and distribute S-Town." (Doc. 14-1, p. 11) (emphasis added). The *S-Town* podcast satisfies the plain and ordinary definition of a "product."

Second, Defendants ignore the broad language of the Act. The Legislature did not limit the Act to "products" and "advertisements" as Defendants argue. The Act was written expansively to include any "products, goods, merchandise, or services entered into commerce in this state ...." *Ala. Code* § 6-5-772(a). To hold that a "product" does not include programs transmitted via television, radio, or the

---

[13] https://www.merriam-webster.com/dictionary/product

[14] https://www.dictionary.com/browse/product

internet would exclude the most common types of commercial communications and would result in a gaping hole in the Act, which the Legislature could not possibly have intended. To adopt such a restrictive interpretation in the face of such broad language would be error.

## B. *S-Town* Advertises the Products of Others.

Defendants also ignore that the Act does not require the Estate to demonstrate that *S-Town* is a "product" if the Estate alleges that Defendants have used McLemore's indicia of identity "for purposes of advertising or selling, or soliciting purchases of, products, goods, merchandise, or services …." *Ala. Code* § 6-5-772(a). In other words, the Estate need not demonstrate that *S-Town* is itself a "product" if the podcast has been used to advertise, sell, or solicit purchases of the "products" of others. In this case, the Estate clearly alleges that Defendants used McLemore's indicia of identity to advertise, sell, and solicit purchases of products each time the podcast is downloaded. (Doc. 1-1, ¶¶ 23, 35).

Defendants argue that the Estate must show the podcast to be an "advertisement," but the language of the Act is not so limited. The second clause of the statute provides liability if a purpose of the podcast was to advertise, sell, or solicit purchase of products, goods, or services. *Ala. Code* § 6-5-722(a). Because

Defendants cannot dispute that the podcast was used to advertise, sell, or solicit purchases of products, they cannot escape coverage under the language of the Act.

## C. *S-Town* Is Not Fair Use.

Although there are no Alabama cases addressing the fair use defenses of the Act, federal courts have held under other statutes that "fair use" presents mixed question of fact and law and generally is not ripe for adjudication on a motion to dismiss. *See Domond v. Peoplenetwork APS,* No. 16-24026-CIV, 2017 WL 5642450, at *3 (S.D. Fla. June 16, 2017) ("Generally, the fair use defense is not ripe for adjudication on a motion to dismiss in a copyright infringement action."); *Roberts v. Gordy*, No. 13-24700-CIV, 2015 WL 11202356, at *6 (S.D. Fla. Sept. 17, 2015) (fair use involves mixed questions of law and fact); *Pergo (Europe) A.B. v. Stanley Black & Decker, Inc.*, No. 4:16-CV-0319-HLM, 2017 WL 3525435, at *6 (N.D. Ga. Jan. 6, 2017) (deferring fair use defense to summary judgment); *Katz v. Chevaldina*, 900 F. Supp. 2d 1314, 1317 (S.D. Fla. 2012) ("Though news reporting and commentary lend themselves to fair uses … such a determination is far from automatic and is more appropriately resolved after the complaint has been answered and parties have evaluated any need for discovery."); *Land's End at Sunset Beach Cmty. Ass'n, Inc. v. Land's End Acquisition Corp.*, No. 8:16-CV-828-T-17JSS, 2016 WL 9526680, at *8 (M.D. Fla. Nov. 7, 2016); *Brookwood Funding, LLC v. Avant*

*Credit Corp.*, Inc., No. 1:14-CV-2960-SCJ, 2015 WL 11504556, at *6 (N.D. Ga. July 28, 2015); and *Rescuecom Corp. v. Computer Troubleshooters USA, Inc.*, 464 F. Supp. 2d 1263, 1267 (N.D. Ga. 2005).

Defendants' motion to dismiss fails to address the Act's multiple **exceptions** to the Act's fair use defenses, which are expressly alleged by the Estate. The Act provides that neither the "public interest work" defense nor the "artistic work" defense is available "if the claimant proves that his or her indicia of identity has been directly connected to and affirmative used in a commercial manner to advertise, promote, or endorse a product, good, or service." *Ala. Code* § 6-5-773(c). At paragraph 35 of the complaint, the Estate alleges that "[t]he *S-Town* podcast constitutes use of McElmore's indicia of identity in a commercial manner to advertise, promote, or endorse a product, good, or service." (Doc. 1-1). Specifically, *S-Town* uses McLemore's indicia of identity as an attraction to gather an audience of consumers to hear paid advertisements for the products of sponsors.

Additionally, the Act provides that the "artistic work" defense does not apply if the "claimant proves … that the use in an artistic work is such as replica as to constitute a copy of the person's indicia of identity for the purposes of trade." At paragraph 34 of its complaint, the Estate alleges that "[t]he *S-Town* podcast constitutes a copy of McLemore's indicia of identity for purposes of trade." (Doc.

31

1-1, ¶ 34).  Therefore, the Estate has properly alleged the exceptions to the potential fair use defenses.

*Ali v. Playgirl, Inc.*, 447 F. Supp. 723 (S.D.N.Y. 1978), is a well known case in which the court considered whether *Playgirl's* publication of an illustration of Muhammad Ali was "for purposes of trade." *Id.* at 727.  As described by the court, the illustration depicted "a nude black man seated in the corner of a boxing ring and is claimed to be unmistakably recognizable as plaintiff Ali." *Id.* at 725.  The court noted that "the picture is a dramatization, an illustration falling somewhere between representational art and cartoon, and is accompanied by a plainly fictional and allegedly libelous bit of doggerel." *Id.* at 727.  Finding that the illustration was published for "purposes of trade," the Court stated:  "The nude portrait was clearly included in the magazine solely '**for purposes of trade e.g., merely to attract attention.**'" *Id.* at 727 (emphasis added).

Here, as in *Ali*, Defendants have use McLemore's indicia of identity "for purposes of trade e.g., merely to attract attention." *Id.*  In the same manner as *Playgirl*, Defendants have used McLemore's identity to attract an audience of consumers who are apparently intrigued by the details of his sex life.  Defendants' motive for the podcast is to attract a large audience to whom they can play paid

advertisements.  They are in the business of turning attention into profit by way of advertisements.

In absence of any Alabama cases on fair use, the Third Circuit's decision in *Taggart v. Wadleigh-Maurice, Ltd.*, 489 F.2d 434 (3d Cir. 1973), helps illustrate why *S-Town* is not saved by the public interest exception.  In that case, the plaintiff was an employee whose job was to empty the latrines at the Woodstock music festival.  In making a documentary about the festival, the defendants took pictures of the plaintiff going about his tasks and "engaged him in conversation, producing comic effects which defendants included in their final product, to great critical claim." *Grant v. Esquire, Inc.*, 367 F. Supp. 876 (1973) (discussing and applying *Taggart*).  "There [was] no dispute that the festival, the preparation of the film, and its distribution to theatres were all undertaken for commercial profit-making purposes." *Taggart*, 489 F.2d at 435-36.  Reversing a grant of summary judgment for the defendant, the Third Circuit found that an issue of fact was presented by the question of whether plaintiff had been "drawn out as a performance in a commercial film," rather than "merely photographed as a participant in a newsworthy event." *Id.* at 438.  As interpreted by subsequent courts, "the message of *Taggart* appears to be that the First Amendment does not absolve movie companies – or publishers – from the obligations of paying their help.  They are entitled to photograph newsworthy

events, but they are not entitled to convert unsuspecting citizens into unpaid professional actors." *Grant,* 367 F. Supp. at 884.

In this case, as in *Taggart*, Defendants have not merely captured McLemore's indicia of identity incidental to a newsworthy event. *S-Town* was produced with profit motive, and Defendants have effectively "drawn out" McLemore as an "unpaid actor" from his interviews about a murder investigation to tell an entirely different story – one that focuses heavily on his sex life – without his consent, so that they can sell advertisements and make money. Defendants' commercial conduct violates the Act and does not qualify as fair use.

## III. The First Amendment Does Not Apply.

### A. The Court Need Not Reach Any Constitutional Issues.

This action consists of state law claims that Defendants removed to federal court on diversity jurisdiction. Because this case arrives on diversity jurisdiction, the First Amendment is no more an issue before this Court than it would have been had it remained in the Circuit Court of Bibb County, Alabama. Significantly, Defendants have not raised any challenge to the constitutionality of the Act, *see* Fed. R. Civ. P. 5.1 (setting forth the requirements for a constitutional challenge), and Defendants acknowledge that the Alabama Legislature was mindful not to abridge any First Amendment rights when it passed the Act. (Doc. 14-1, p. 8 ).

Relatedly, federal courts take caution to avoid deciding constitutional issues where possible. *Hayden*, 506 F.Supp. 2d at 946 citing *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."). Here, Defendants prematurely asks this Court to decide First Amendment issues, despite their lack of any constitutional challenge to the Act.

The question before the Court in this diversity case is whether the Estate has alleged a valid claim for relief under the Act. As explained above, the Estate has done so, and Defendants' motion to dismiss should be denied without reaching any unnecessary First Amendment issues.

**B.    The Estate's Claims Do Not Violate the First Amendment.**

To the extent this Court is inclined to consider Defendants' First Amendment arguments, those argument are ultimately due to fail. Curiously, Defendants motion to dismiss (which successfully located dozens of First Amendment decisions from other jurisdictions) failed to locate the one and only case in which the United States Supreme Court has addressed the First Amendment in a right of publicity case.

In *Zacchini v. Scripp-Howard Broadcasting Co.*, 433 U.S. 562 (1977), the Supreme Court considered a right of publicity claim brought by a "human

cannonball" performer against a television broadcast company that aired a recording of his performance without his permission. The state court granted summary judgment to the defendant on grounds that the broadcast was protected by the First Amendment because it was newsworthy and entertaining. *Id.* at 564. The Supreme Court granted certiorari to consider whether the First Amendment provided immunity from damages on a right of publicity claim. *Id.* at 566. The Supreme Court reversed the state court's decision, holding the First Amendment did **not** protect against a right of publicity claim. *Id.* In reaching that decision, the Court stated as follows:

> There is no doubt that entertainment, as well as news, enjoys First Amendment protection. It is also true that entertainment itself can be important news. But it is important to note that neither the public nor respondent will be deprived of the benefit of petitioner's performance as long as his commercial stake in his act is appropriately recognized. **Petitioner does not seek to enjoin the broadcast of his performance; he simply wants to be paid for it.** Nor do we think that a state-law damages remedy against respondent would represent a species of liability without fault contrary to the letter or spirit of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Respondent knew that petitioner objected to televising his act, but nevertheless displayed the entire film.
>
> **We conclude that although the State of Ohio may as a matter of its own law privilege the press in the circumstances of this case, the First and Fourteenth Amendments do not require it to do so.**

*Id.* at 578–79.

Thus, the Supreme Court's one and only case says that the First Amendment does not apply to an action seeking to recover a defendant's commercial profits from the use of a person's identity. Here, as in *Zacchini*, the Estate has not sought to enjoin Defendants from speaking or from airing the *S-Town* podcast. Rather, as with the right of publicity claim in *Zacchini*, the question is: Who is entitled to the profits from a commercial endeavor based on the use of McLemore's indicia of identity? *Zacchini* holds that the First Amendment does not protect Defendants from a right of publicity claim to recover the profits derived from their use of McLemore's indicia of identity in a commercial endeavor without his consent.

In addition to ignoring the only Supreme Court decision on this issue, Defendants conveniently fail to locate the Eleventh Circuit's most important decision on the First Amendment in a right of publicity case. In *Toffoloni v. LFP Publishing Group, LLC*, 572 F. 3d 1201 (11th Cir. 2009), the estate of a female wrester who was murdered by her husband (also a well-known professional wrestler) brought a state law right of publicity claim against *Hustler Magazine* for publishing a biographical piece accompanied by nude photos of the female wrestler. As in this case, the action was removed to federal court, where *Hustler* argued that the publication was protected by the First Amendment. *Id.* at 1204. The trial court

agreed and dismissed the action for failure to state a claim – but it was later held in error for doing so. *Id.*

On appeal, the Eleventh Circuit reversed the dismissal, stating that although biographical part of the article was within the purview of the First Amendment, the nude photos were not. As Defendants attempt to do here, *Hustler* attempted to spin the article as a "public interest" piece, arguing that it included "comment on the modest on the life, career, and tragic death of Benoit, and that the photos were from that period in her life, such that they were of substantial public interest and are therefore newsworthy." *Id.* at 1208. (*C.f.* Doc. 14-1, p. 6, describing *S-Town* as "the experience of a non-heterosexual man in Alabama."). The Eleventh Circuit rejected *Hustler*'s argument and held that the nude photos were not a matter of legitimate public interest and were not newsworthy. In doing so, the Court explained:

> LFP may not make public private, nude images of Benoit that she, allegedly, expressly did not wish made public, simply because she once wished to be a model and was then murdered. When a person is involuntarily involved in a newsworthy incident, not all aspects of the person's life, and not everything the person says or does, is thereby rendered newsworthy.

> We agree with the Ninth Circuit that most persons are connected with some activity, vocational or a vocational, as to which the public can be said as a matter of law to have a legitimate interest or curiosity. To hold as a matter of law that private facts as to such persons are also within the area of legitimate public interest could indirectly expose everyone's private life to public view.

Moreover, we are guided by the Tenth Circuit's conclusion that because each member of our society at some time engages in an activity that fairly could be characterized as a matter of legitimate public concern, to permit that activity to open the door to the exposure of any truthful secret about that person would render meaningless the tort of public disclosure of private facts. We agree with the Tenth Circuit that the First Amendment does not require such a result. **Therefore, to properly balance freedom of the press against the right of privacy, every private fact disclosed in an otherwise truthful, newsworthy publication must have some substantial relevance to a matter of legitimate public interest.**

The photographs published by LFP neither relate to the incident of public concern conceptually nor correspond with the time period during which Benoit was rendered, against her will, the subject of public scrutiny. The photographs bear no relevance—let alone "substantial relevance"—to the "matter of legitimate public interest." On these facts, were we to hold otherwise, LFP would be free to publish any nude photographs of almost anyone without their permission, simply because the fact that they were caught nude on camera strikes someone as "newsworthy." Surely that debases the very concept of a right to privacy.

*Id.* at 1211-12 (emphasis added) (internal quotes and citations omitted).

In *Toffoloni,* the Eleventh Circuit properly distinguished between publication of prurient matters, such as nude photos of a deceased person (or, in this case, explicit information and descriptions about a deceased person's alleged sexual activities), from news or art. Just as the nude photos in *Toffoloni* had no relevance to any matter of legitimate public interest*, S-Town* contains numerous aspects of McLemore's private life that have no relevance to any legitimate matter of public concern. While it is true that *S-Town* did not contain nude images of McLemore

39

(because it was an audio broadcast), Defendants nevertheless took the medium as far

into the gutter as it would go, even playing the audio of McLemore groaning while

having his nipple tattooed with an empty needle. (Doc. 14-8, pp. 20-21). This is

equally loathsome if not worse than the defendants' publication of the nude photos

in *Toffoloni*.

The First Amendment cases cited by Defendants are legally and factually

distinguishable. First, instead of addressing the binding decision in *Toffoloni*,

Defendants seek to rely on decisions from other jurisdictions who have taken a more

liberal view of the First Amendment than the Eleventh Circuit.[15] (Doc. 14-1, pp. 14-

15). Despite their volume, the all of the non-binding cases cited by Defendants are

---

[15] *E.g. De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845 (Ct. App. 2018); *Sarver Chartier*, 813 F. 3d 891 (9th Cir, 2016); *Alfano v. NGHT*, 623 F. Supp. 2d 355 (E.D.N.Y. 2009); *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536 (1993); *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118 (N.D. Cal. 2002); *Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996); *Matthews v. Wozencraft,* 15 F. 3d 432 (5th Cir. 1994); *Tyne v. Time Warner Entm't Co.*, 901 So. 2d. 802 (Fla. 2005); *Enterprises, Inc. v. McGraw-Hill Book Co.*, 85 Misc 2d 583 (N.Y. Sup. 1975); *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664 (2010); *Ruffin-Steinback v. dePasse*, 82 F. Supp. 2d 723 (E.D. Mich. 2000); *Hicks v. Casablanca Records*, 464 F. Supp. 426 (S.D.N.Y. 1978); *Meeropol v. Nizer*, 560 F.2d 1061 (2d Cir. 1977); *Moore v. Weinstein Co., LLC*, 545 F. App'x 405 (6th Cir. 2013); and *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860 (1979); *McKinney v. Morris*, No. LC095322, 2013 WL 5617125, (Cal. Ct. App. Oct. 15, 2013); *Cardtoons L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959 (10th Cir. 1996).

distinguishable. Cases such as *McKinney* (a documentary on abuse in the Mormon church) and *Dora* (a documentary about surf culture in California), involved matters that were of legitimate public interest. Cases such as *Alfano* (John Gotti), *De Havilland* (a famous actress), *Seale* (a Black Panther leader), *Rosemont* (Howard Hughes), *Ruffin-Steinback* (the Temptations), *Casablanca Records* (Agatha Christie), *Moore* (a famous singer), involved people who, unlike McLemore, were public figures prior to the publication. Cases such as *Sarver* (the Hurt Locker), *Matthews* (RUSH, a fiction novel), *Tyne* (The Perfect Storm), *Meeropol* (The Implosion Conspiracy), *Gulielmi* (a fictionalized movie), involved fictionalized stories, which *S-Town* does not profess to be.

As much as Defendants might prefer the views of other courts in other jurisdictions, this Court must follow the decisions of the Supreme Court (*Zacchini*) the Eleventh Circuit (*Toffoloni*). Under *Zacchini*, 433 U.S at 578-79, Alabama has no obligation to afford First Amendment protection to a defendant's profits from a commercial broadcast. Additionally, under *Toffoloni,* 572 F. 3d at 1211-12, the First Amendment does not apply unless every private fact disclosed in an otherwise truthful, newsworthy publication has some substantial relevance to a matter of legitimate public interest. As demonstrated above, *S-Town* contains numerous private facts which have no such relevance. Were this Court to follow the decisions

cited by Defendants, rather than *Zacchini* and *Toffoloni*, it would be applying the wrong law and would be committing error.

Defendants cite *J.C. v. WALA-TV, Inc.*, 675 S.2d 360 (Ala. 1996), for the Alabama Supreme Court's recognition that the public interest privilege "extends to information concerning all phases of human activity and embraces all issues about which information is **needed or appropriate** so that individual may cope with the exigencies of their period." *Id.* at 362 (emphasis added). However, Defendants conveniently ignore the requirement (one that is consistent with *Toffoloni*) that the information must be "needed or appropriate." Defendants fail to explain how items such as the audio of McLemore groaning while having his nipple tattooed is "needed or appropriate."

The Alabama decision in *Minnifield v. Ashcraft*, 903 So. 2d 818 (Ala. Civ. App. 2004), is also consistent with the Eleventh Circuit's view of the First Amendment. In that case, the plaintiff brought a commercial-appropriation invasion of privacy claim due to publication of her tattooed breast in a national tattoo magazine. *Id.* The Alabama Court of Civil Appeals held that the photos were published in the magazine for commercial benefit and did not pertain to a legitimate newsworthy public interest. *Id.* Therefore, the publication was not protected. *Id.*

Defendants also cite *Doe v. Roe*, 638 So. 2d 826 (Ala. 1994), in which the children of a murder victim sought an injunction to prevent publication of a fictionalized novel based upon their father's killing and dismembering of their mother. That case is distinguishable on several grounds. First, it involved an attempt to enjoin a publication as a prior restraint on speech. Since the Estate is not seeking to enjoin the podcast, similar First Amendment protection does not apply here. *See Zacchini*, 433 U.S. at 578-79 ("Petitioner does not seek to enjoin the broadcast of his performance; he simply wants to be paid for it.").

Second, *Doe* involved a newsworthy event – a murder and a resulting trial, which the Court noted "received much publicity." *Doe*, 638 So. 2d at 827. Although this case also involved a death, McLemore's death did not prompt any news or publicity. Nearly two years passed after McLemore's death with no known news interest beyond his three-line obituary.

Third, unlike the present case, there is no indication that the novel in *Doe* delved unnecessarily into the private sexual activities or secret fetishes of the plaintiffs. Thus, *Doe* did not involve matters that were not "needed or appropriate," per *WALA-TV, Inc*., and it did not involve private facts that lacked substantial relevance, per *Toffoloni. See also Holloway v. American Media, Inc.*, 947 F. Supp. 2d 1252 (N.D. Ala. 2013) (distinguishing both *WALA-TV* and *Doe*).

Finally, the decision in *O'Grady v. Twentieth Century Fox Film Corp.*, No. 5:02 CV 173, 2003 WL 24174616 (E.D. Tex. Dec. 19, 2003), provides a well-reasoned discussion of the types of considerations warranting denial of Defendants' motion to dismiss. That case involved a claim by Scott O'Grady, a real-life Air Force pilot whose fighter jet was shot down over Bosnia in 1995. *Id.* at *2. In 1996, O'Grady gave an extended interview to the BBC about his experience, from which the BBC created a "docu-drama" entitled *Missing in Action*. *Id.* In 1997, the BBC licensed the docu-drama to one of the defendants, who re-broadcast the program under the title, *Behind Enemy Lines: The Scott O'Grady Story*. *Id.* The docu-drama was broadcast 34 times to millions of viewers in the United States. *Id.*

As the basis for his lawsuit, O'Grady alleged that the defendants used his indicia of identity in the re-broadcast of the docu-drama to promote the motion picture, *Behind Enemy Lines*, a fictionalized portrayal of his ordeal in Bosnia. *Id.* O'Grady alleged that he did not consent to the use of his name, image, and likeness to promote the *Behind Enemy Lines* movie, and that the defendants had therefore misappropriated his indicia of identity for a commercial purpose. *Id.* at *7. The defendants sought summary judgment, arguing that O'Grady's ordeal was a newsworthy event and that the re-broadcast of the docu-drama was otherwise protected by the First Amendment. *Id.* at *10.

The United States District Court for the Eastern District of Texas rejected the First Amendment defenses and held that O'Grady's claims presented factual questions for a jury to decide. On the issue of whether O'Grady's identity was used for commercial purposes, the court concluded that "there is a genuine issue of material fact as to whether the November 28 Rebroadcast was created to capitalize upon the commercial value associate with Plaintiff's name, life, and image to promote the Movie." *Id.* at *9. Highlighting the importance of discovery to determine the defendants' motives, the court noted that "the correspondence between Fox Film and DCI relating to the production of the Rebroadcast creates a fact issue as to whether Defendants created the program for a commercial purpose." *Id.*

The court next addressed the defendants' argument that the rebroadcast of the docu-drama was protected by the newsworthiness exception. *O'Grady*, 2003 WL 24174616 at *10. Rejecting that argument, the court stated:

> The Court is not convinced Defendants' use of Plaintiff's name, likeness, and image was for a historical or newsworthy purpose. There is a fact issue of whether the Rebroadcast constitutes commercial speech notwithstanding the fact that the Rebroadcast contained educational elements intended to contrast "the fact and fiction of true survival" and the fact that Plaintiff's ordeal was newsworthy at one time.

*Id.* at \*10.  The court also found the degree of the defendants' commercial benefit probative, noting:

> [T]he Rebroadcast delivered over 25 million household impressions at an estimated $300,000 value.  There is sufficient evidence in the record to create a genuine issue of material fact that Defendants created the November 28 Rebroadcast in furtherance of their economic motivation.

*Id.* at \*11.  In their notice of removal, Defendants affirmatively alleged that the profits from *S-Town* exceed $75,000, (doc. 1-8, ¶ 5), and the Estate expects discovery to show that Defendants' commercial benefit from delivering the podcast to more than 80 million consumers is far more than the $300,000 at issue in *O'Grady*.[16]

Lastly, the court addressed the defendants' argument of First Amendment protection.  O'Grady argued that the "Rebroadcast delivers a false and misleading message that Plaintiff endorsed or was involved in the Movie and that the Movie is Plaintiff's story."  *Id.* at \*11.  The court held that this argument also raised a fact issue for the jury:

> Considering the combination of all of the characteristics of the Rebroadcast, namely the evidence that the Rebroadcast was an

---

[16] "Ads in top programs can command $50 to upward of $100 CPMs, which represents the cost of reaching a thousand podcast downloaders." https://www.wsj.com/articles/podcasts-face-advertising-hurdles-1455745492.

advertisement for the Movie, the Rebroadcast related to the Movie, and Defendants have an economic motive for the speech, the Court concludes there is fact issue whether the Rebroadcast is commercial speech.

*Id.* at 13.

As in *O'Grady*, Defendants are using McLemore indicia of identity in a false and misleading manner to suggest that the podcast is endorsed as a true account of McLemore's life.  They carefully edited the podcast to suggest to the audience that McLemore somehow invited this story about his sexual activities and nipple piercings, when what McLemore actually inquired about was a suspected murder that had nothing to do with his own personal life.  And, as in *O'Grady*, Defendants' actions had profit motive.  Just like the defendants in *O'Grady* used the docu-drama to promote their movie, Defendants in this case are using *S-Town* to promote the products of their sponsors.

## IV.  The Estate Has Alleged Other Valid State Law Claims.

Defendants fail to demonstrate an entitlement to dismissal of the Estate's other state law claims.  Defendants cite a non-binding Sixth Circuit decision, *Ruffin-Steinback v. dePasse*, 267 F. 3d 457 (6th Cir. 2001), for the proposition that the Court should dismiss an unjust enrichment claim if it is "entirely derivative" of another claim.  (Doc. 14-1, p. 26).  Contrary to Defendants' conclusory argument, the Estate's unjust enrichment claim is not derivative or duplicative of its claim under

47

the Alabama Right of Publicity Act.  It is an independent and alternative theory of recovery.

"The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another." *Tate v. Water Works & Sewer Bd. of City of Oxford*, 217 So. 3d 906, 920 (Ala. Civ. App. 2016).  "[T]o prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation." *AAL USA, Inc. v. Black Hall Aerospace, Inc., No.* 2:16-CV-02090-KOB, 2018 WL 1157201, at *5 (N.D. Ala. Mar. 5, 2018), citing *Matador Holdings, Inc. v. HoPo Realty Investments, LLC*, 77 So. 3d 139, 145 (Ala. 2011).

Defendants apparently believe that, because the Estate's various claims are based upon a common set of facts, any claims other than those under the Act should be dismissed.  In *AAL USA, Inc. v. Black Hall Aerospace, Inc.,* 2018 WL 1157201, at *8, the court considered whether a party could plead a claim of breach of contract and unjust enrichment based on the same common set of facts.  The court properly recognized that although "a party cannot *recover* for both breach of contract and unjust enrichment when the claims are based on the same set of facts. … Alabama

law does not appear to bar a party from *pleading* breach of contract *and* unjust enrichment in the alternative." *Id.* Thus, the court refused to dismiss the unjust enrichment claim merely because the plaintiff had also pleaded a breach of contract claim. Therefore, even if recovery on the Estate's claims under the Act would preclude recovery for unjust enrichment, it is clear that the Estate can simultaneously maintain both claims.

Citing *Radenhausden v. Doss*, 819 So. 616 (Ala. 2001), Defendants argue that constructive trust and accounting are remedies, and not causes of action. However, they fail to analyze the *Radenhausden* decision, where the trial court was reversed for dismissing the claims for constructive trust and accounting.

Finally, with respect to the Estate's request for declaratory relief, there is a justiciable controversy beyond whether the *S-Town* podcast violates the Alabama Right of Publicity Act. The Estate alleges that Defendants are attempting to use McLemore's indicia of identity for a motion picture in violation of the Estate's exclusive rights. (Doc. 1-1, ¶ 48). Declaratory judgment and injunctive relief is the proper method by which to resolve that dispute. *See Privilege Underwriters Reciprocal Exch. v. Grayson*, 226 So. 3d 653, 659 (Ala. 2016) ("All that is required for a declaratory judgment action is a bona fide justiciable controversy.").

## CONCLUSION

As set forth above, the Estate has alleged a valid claim for relief under Alabama law. Defendants' motion to dismiss raises fact-dependent arguments which are premature and are ultimately due to fail. Accordingly, the Estate requests that the Court deny Defendants' motion to dismiss.

Respectfully submitted this 5th day of September, 2018.

/s/ Richard J.R. Raleigh, Jr.
Richard J.R. Raleigh, Jr.

/s/ Christopher L. Lockwood
Christopher L. Lockwood

WILMER & LEE, P.A.
100 Washington Street, Suite 100
Huntsville, AL 35801
T (256) 533-0202
F (256) 533-0303
rraleigh@wilmerlee.com
clockwood@wilmerlee.com

s/ R. Cooper Shattuck
R. Cooper Shattuck

COOOPER SHATTUCK, LLC
P.O. Box 3142
Tuscaloosa, AL 35403
T (877) 442-6673
cooper@coopershattuck.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 5, 2018 the foregoing was filed

via the ECF system, thus serving all parties.

By: /s/ Richard J.R. Raleigh, Jr.
Richard J.R. Raleigh, Jr.